Fred STANLEY, Petitioner–Appellant,

v.

Alan J. LAZAROFF, Warden, Respondent–Appellee.

No. 01–4340.

United States Court of Appeals, Sixth Circuit.

Oct. 3, 2003.

Before MOORE and GIBBONS, Circuit Judges, and JORDAN, District Judge.*

GIBBONS, Circuit Judge.

Fred Stanley, who is deaf and mentally impaired, was convicted of murder in Ohio state court. Arguing that the state court erred in determining that he was competent to stand trial and in determining that he knowingly waived his *Miranda* rights before confessing to the murder, he seeks a writ of habeas corpus. For the following reasons, we affirm the district court's denial of habeas relief.

## I.

Thelma Beck was stabbed to death in her home in April 1990. In 1992, fingerprints taken from the scene were matched through a computer system to Stanley's prints. An Ohio appellate court described the ensuing events as follows:

> The police then went to [Stanley's] home and requested that [he] accompany them to the police station for questioning. [Stanley] is deaf, mildly retarded and unable to communicate verbally. However, his brother was able to convey the officers' message to [Stanley] through sign language. [Stanley] agreed to go with the officers.
>
> At the station, Detective Feldhaus attempted to communicate with [Stanley] by writing messages to him. However,

it soon became clear to Detective Feldhaus that [Stanley] could neither read nor write competently. Unfamiliar with sign language himself, Detective Feldhaus called Brian Stricker, another Cincinnati Police Officer, who was believed to be able to communicate in sign language.

Officer Stricker arrived at the station and began to "sign" to [Stanley]. After determining for himself that he and appellant were effectively communicating, Officer Stricker signed the *Miranda* warnings to [Stanley] and had [him] put his signature on a form that stated that he had been given the warnings and understood them. Detective Feldhaus then began interrogating [Stanley] through Officer Stricker.

[Stanley] was shown pictures of the victim and her house, but he initially indicated that he did not recognize the victim or the house. Uncertain that [Stanley] understood what the officers were asking, the officers decided to take [him] to the scene of the crime. Even when [Stanley] was standing in front of the house, he responded in the negative when Officer Stricker asked him if he knew the place or had been there.

While the officers and [Stanley] were in front of the house, a car drove by and someone in the car allegedly called out to [Stanley]. Officer Stricker stated that [Stanley's] demeanor changed after the car drove by. Detective Feldhaus noted where the car stopped and proceeded to question the occupants of the car to see how they were acquainted with [Stanley]. Detective Feldhaus testified that these persons told him that

---

* The Honorable Leon Jordan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

[Stanley] had frequently been in that neighborhood and had, on occasion, performed odd jobs for the victim.

With this information, the officers and [Stanley] returned to the station, where Officer Stricker informed [Stanley] that they knew he was not telling the truth about being at the house. At that point, according to Officer Stricker, [Stanley] confessed to killing the victim, allegedly because of a dispute concerning work he had performed for her.

Following further interrogation, the officers decided to videotape their communications with appellant. On tape, Officer Stricker repeated the *Miranda* warnings he had given appellant, and appellant, in sign language, indicated that he understood what Officer Stricker was communicating. Officer Stricker then questioned appellant about the murder. On tape, appellant indicated by a stabbing motion how the victim had been killed, and also indicated by pointing on his body the places where the victim had been stabbed: in the abdomen, the chest, the left leg, and the throat.

*State v. Stanley,* 121 Ohio App.3d 673, 700 N.E.2d 881, 884–85 (1997) (footnote omitted).

Stanley was charged with Thelma Beck's murder. His court-appointed attorney contested Stanley's competency to stand trial, and Stanley was examined by several medical experts. Following a hearing before Judge Howard Sundermann, Jr., on March 5, 1993, the state trial court found Stanley incompetent to stand trial and not restorable to competency within one year. Pursuant to O.R.C. § 2945.38(G), the court dismissed the indictment against Stanley.

Stanley was reindicted for the same crime on March 19, 1993, pursuant to O.R.C. § 2945.38(H). The case was assigned to Judge Sundermann, and the court *sua sponte* raised the issue of Stanley's competency to stand trial and ordered another hearing on the issue.[1] A second competency hearing was held on May 13, 1993, after which the court found that Stanley was competent to stand trial. On May 25, 1993, defense counsel filed a motion to suppress Stanley's confession on the grounds that it was "obtained without prior advice and recognition of Defendant's right to remain silent and to have effective assistance of counsel and/or without Defendant's knowing and/or voluntary and/or intelligent waiver of those rights." After a hearing and briefing by the parties, the court orally denied the motion to suppress. A jury convicted Stanley. However, when it was discovered that the bailiff had answered a question asked by the jurors during deliberation, he was granted a retrial and the case was reassigned to Judge Ann Marie Tracey.

Defense counsel again raised the issue of Stanley's competency to stand trial, and the court held a third hearing at which numerous expert witnesses testified for both parties. On December 22, 1994, the court found that he was competent to stand trial. The court noted that Stanley "has communication problems because he is prelingually deaf and because he has a lower level of intellectual functioning" but found that "[t]hese difficulties do not constitute a mental condition which precludes [Stanley] from understanding the nature and objective of the proceedings[ ] and assisting the defense." Also, during a pretrial hearing on March 8, 1995, the court denied a motion to reconsider the earlier

**1.** Before the district court, Stanley argued that it was improper for the state court to allow a reindictment and to order a second competency hearing, but he does not raise these arguments in this appeal.

denial (by Judge Sundermann) of the motion to suppress Stanley's confession. Stanley was again tried for murder, and again a jury returned a guilty verdict. Stanley was sentenced to fifteen years to life in prison.

Stanley appealed to the Ohio Court of Appeals, First District,[2] which affirmed his conviction. He then sought leave to appeal to the Ohio Supreme Court, which denied leave to appeal because Stanley had not raised any substantial constitutional question.

On January 27, 1999, Stanley sought federal habeas relief, raising three issues in his petition:

**Ground One:** The judgement against Petitioner is void or voidable because Petitioner is incompetent and to proceed to trial violates the Defendant's Constitutional due process right to a fair trial.

**Ground Two:** The judgment against Petitioner is void because law enforcement obtained his confession in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), violating Petitioner's rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

**Ground Three:** The judgment against Petitioner is void or voidable because the Prosecutor engaged in misconduct by violating the rules of discovery and prejudicing Petitioner with the jury at trial in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

The district court determined that the petition was not barred by the statute of limitations and that Stanley had exhausted his state court remedies as required. The matter was referred to United States Magistrate Judge Jack Sherman, Jr., who issued a report and recommendation that the petition for writ of habeas corpus be denied. After considering objections from both parties, the district court adopted the magistrate judge's report and recommendation and denied the petition on November 22, 2001. The district court also granted a certificate of appealability with respect to the claim in Ground One challenging the propriety of the state court's ruling that Stanley was competent to stand trial and the claim in Ground Two challenging the admission of Stanley's confession into evidence. Stanley filed a timely appeal.

## II.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") applies to this case. Under 28 U.S.C. § 2254(d), a federal court may not grant habeas relief unless the adjudication in the state court proceedings:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;

or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under AEDPA, "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Rather, the issue is whether the state court's decision was "contrary to" or "an unreasonable application of" clearly established federal law. A decision is "contrary to" clearly estab-

---

**2.** We also refer to this court as simply "the Ohio Court of Appeals" in this opinion.

lished federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts materially indistinguishable from a relevant Supreme Court precedent and arrives at the opposite result. *Id.* at 405. Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but applies that principle to the facts of the prisoner's case in an objectively unreasonable way. *Id.* at 413, 410–11.

A federal court applies a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. 28 U.S.C. § 2254(e)(1); *Warren v. Smith,* 161 F.3d 358, 360–61 (6th Cir.1998). This court gives complete deference to the federal district court's and state court's findings of fact supported by the evidence. *Clemmons v. Sowders,* 34 F.3d 352, 354 (6th Cir.1994).

### III.

#### A. Competency to Stand Trial

◼ Stanley argues that the state court's determination that he was competent to stand trial involved an unreasonable determination of the facts in light of the evidence and was contrary to clearly established federal law.

The Ohio appellate court extensively summarized the testimony presented at the three competency hearings. The first hearing, at which the state presented no expert testimony, resulted in a finding that Stanley was incompetent. The second hearing resulted in a finding that Stanley was competent, but the ensuing trial resulted in a mistrial. The third hearing, before Judge Tracey, also resulted in a finding that Stanley was competent, and

this is the ruling that Stanley now challenges.

At the third hearing, the state presented the testimony of Dr. Emanuel Tanay, a licensed forensic psychiatrist who had significant experience in evaluating defendants for competency to stand trial, and Dr. Glenn Weaver. However, the trial court found Weaver's testimony unreliable and did not consider Weaver's opinion in making the determination of competency. The defense presented the testimony of Dr. Nancy Schmidtgoessling, a psychologist at the Court Psychiatric Center; Dr. McKay Vernon, a psychologist and nationally recognized expert in the psychological examination of hearing-impaired individuals, including those who are also mentally retarded; and Dr. Caroline Everington, a psychologist who designed a widely-used test called the Competence Assessment for Standing Trial for Defendants With Mental Retardation.

Tanay interviewed Stanley twice with the help of interpreters and reviewed Stanley's school records and medical records, other experts' opinions, and the transcript of the previous competency hearings. The trial court summarized Tanay's testimony as follows:

> Dr. Tanay reported that Stanley communicated quite well on a variety of levels with the people around him through the use of the interpreters. He noted that it was psychiatrically significant that Stanley could comprehend the questions communicated by the interpreters, that he responded appropriately, provided information and that he could comprehend what was involved in the questioning process.

> Tanay also found that Stanley could explain to him that his statement was coerced by the police and that the person who had cooperated with the police was a liar. Stanley ... understood that

if he behaved a certain way punishment would follow and he knew that he should not fight with the police. He also understood that a transgression of the law was punishable. He noted for Dr. Tanay that he did not "kill the old lady" (Dr. Tanay's words) but that he had worked for her. Tanay further reported that Stanley was aware of the court system, had previous contacts with it and knew that after these kinds of evaluations he was permitted to go home without standing trial.

Dr. Tanay also found psychiatrically significant that at first Stanley had denied the offense when questioned by the police and then admitted it. It was also important that he denied ever having been in the Beck residence, but upon being confronted with evidence to the contrary, he changed his story. Dr. Tanay noted that once Stanley realized something specific was the subject of inquiry, such as the function of the judge, he would become non-responsive to that type of questioning. All of this caused Dr. Tanay to conclude that Stanley exercised some degree of manipulation in his interaction and communication with others.

As part of Dr. Tanay's preparation for testifying with respect to Stanley, he reviewed a video tape of the previous motion to suppress hearing. The Court also had an opportunity to review it during the competency hearing. He noted that the tape indicated that while he was being implicated by the witness Julius Thrasher,[3] Mr. Stanley responded

with "bullshit." Dr. Tanay [stated] that this confirmed his other observations that Stanley had the ability to understand, communicate, object, and express disapproval.

The state appellate court added that "Tanay found that [Stanley] was 'goal directed' in his responses to questions and knew it would be helpful to him to be deceptive.... Tanay stated that, in his opinion, [Stanley] was malingering and was fully able to understand the nature of the proceedings against him and to participate in his defense." State v. Stanley, 700 N.E.2d at 892.

The trial court summarized the testimony of defense expert Dr. Vernon, who reviewed Stanley's records and interviewed Stanley twice, as follows:

Dr. Vernon is skilled in the language of signing and was able to communicate directly to Mr. Stanley. He noted that Mr. Stanley has a limited ability to sign, and that his ability is primarily in the area of discussing practical living matters. Dr. Vernon stated Mr. Stanley is not competent to deal with technical vernacular or other conceptual materials. His ability to finger spell is limited because he has a low reading level. Dr. Vernon further pointed out that in signing there is no past tense which makes more difficult discussions with respect to time....

Dr. Vernon gave Mr. Stanley a reading test, a signing test, and a personality test. He reported that Stanley read at a grade level of 1.1, noting that one is functionally illiterate if [his] reading lev-

---

**3.** Thrasher was incarcerated in a cell next to Stanley's, and he testified at a suppression hearing that Stanley was able to communicate with him and other inmates using simple sign language. Thrasher stated that Stanley had indicated to him that he had killed an elderly woman. When the interpreters at the hearing signed to appellant what Thrasher

was saying, which was done by using a gesture indicating stabbing, Stanley "became agitated and mouthed the words 'bullshit' and 'not me.' The words were audible, though garbled. This was the only time ... that [Stanley] visibly or audibly reacted to testimony." State v. Stanley, 700 N.E.2d at 892.

el is grade 2.9 or below. . . . Dr. Vernon concluded that Mr. Stanley is mildly mentally retarded based on his adaptive level and I.Q. score. . . .

With respect to Court proceedings, Dr. Vernon attempted to discuss the participants in the proceedings with Stanley. He noted that Stanley might smile and nod but may not really understand what was being asked. He noted that a more appropriate questioning procedure with Mr. Stanley or any person who is deaf, rather than "do you understand" is to say "tell me what I said." Although Dr. Vernon noted that Stanley did not know what witnesses were and that it would be difficult to explain that concept to him, he later noted that with respect to a witness Stanley could probably understand that a witness was someone who saw something and came to court to testify[,] if time were taken to communicate that.

With respect to Stanley's reaction in the motion to suppress hearing of the testimony/actions of Julius Thrasher, Dr. Vernon noted that because [stabbing] was being acted out and he understood the context, it would make him angry and he could understand it. Vernon has seen defense counsel Cathy Cook attempt to communicate with Stanley and opined she was not able to discuss anything of significance. He noted that at best Stanley could provide some rudimentary and somewhat contradictory information.

The state appellate court added:

Vernon stated an opinion that appellant could not understand abstract concepts in general, and that appellant was unable to understand the specific concepts

regarding the trial setting and the different actors involved, or to assist his attorney. He stated that appellant's responses to Officer Stricker's "yes/no" questions did not accurately reflect appellant's level of comprehension; using an open-ended question format, Vernon determined that appellant was incapable of communicating information back to Vernon in a comprehensible manner.

However, Vernon did state that appellant knew that he had been accused of killing an elderly woman and that killing was wrong. Appellant was able to communicate to Vernon past incidents in his life when he had done something and was punished or scolded for it, and demonstrated an ability to understand when he had done something wrong.[4]

*State v. Stanley,* 700 N.E.2d at 890.

Next, the trial court discussed the testimony of Dr. Schmidtgoessling, a licensed clinical psychologist who works extensively in the area of competency to stand trial. Schmidtgoessling interviewed Stanley three times over a three-year period, spending about eight hours with him total. The trial court provided the following description of her testimony:

[Dr. Schmidtgoessling] assessed Mr. Stanley as being mildly mentally retarded. She bases this on his intellectual functioning, records, interviews, and the fact of his meeting the adaptive behavior profile for one who is mentally retarded. . . . She further found that he has trouble sequencing events, over-personalizes matters and has a disjointed style. She noted that he operates on a very concrete level and cannot conceptualize and that his comments and reactions are often irrelevant. She further noted that

4. Here, the Ohio Court of Appeals was describing Vernon's testimony at the second competency hearing, but it noted that Tanay, Vernon, and Schmidtgoessling testified at both the second and third hearings and that their reasons for their conclusions were the same at each hearing.

one's deafness could complicate the matter as much of socialization is incidental and people who are deaf may miss this. Dr. Schmidtgoessling reported that the defendant has a superficial understanding of who people are and that he often fails to recognize her [and] the interpreter, that he does not know what his attorney Ms. Cook does, what the prosecution does or other rules of evidence. He indicated that his understanding of a judge is that a judge sits and writes and that the jury looks back and forth. Although Dr. Schmidtgoessling tried to discuss the proceedings by using a concrete analogy of basketball, he still could not grasp these concepts. She noted that according to Ms. Cook, the defendant could not provide information about his whereabouts, the time of the offense[,] or witnesses. She noted that although she made repeated efforts to explain the proceedings, she could not obtain a coherent answer from him. She [stated] that he would be unable to testify in a relevant, coherent manner. On cross-examination, Schmidtgoessling stated that educating Stanley about the court process was "plausible."

Finally, although Judge Tracey did not discuss it in her ruling, Dr. Everington also offered testimony, which the Ohio Court of Appeals summarized as follows:

[Everington] determined that appellant was mildly retarded. [Using the test she had developed,] Everington concluded that . . . [Stanley] was well below the suggested cutoff for competency. Additionally, she found by the use of open-ended questions that appellant had little ability to understand the legal process, to work meaningfully with an attorney, or to comprehend the significance of events in the case. . . .

Everington . . . stated on cross-examination that appellant was able to adequately communicate that he had been questioned by the police, that he believed the police had tricked him, that he knew he had been charged with murder, and that he knew who his attorney was. Everington denied seeing any signs of malingering or deception.

*State v. Stanley*, 700 N.E.2d at 890–91 (footnote omitted).

The trial court considered Tanay, Vernon, and Schmidtgoessling to be "professional and reliable." It stated that they all agreed that Stanley is deaf and is mentally impaired but varied in their ultimate conclusions about whether Stanley was competent to stand trial. The trial court found that Stanley has "significant communication problems" because he is prelingually deaf (that is, he was deaf before he learned to speak) and because he has a low level of intellectual functioning. Based on Tanay's opinion, however, the trial court found that there was sufficient evidence of Stanley's competence. It made the following findings:

Successful communication with Stanley depends on both participants making an effort, which produces an understanding. For instance, Stanley, with some effort on the part of Dr. Vernon, understood what a witness was. While Dr. Vernon was concerned there would not be a verbatim translation of his testimony, this does not interfere with Stanley's due process rights.

Along this line, Dr. Schmidtgoessling could not determine if Stanley's difficulties in understanding concepts were due to mental retardation or deafness. She noted that to her understanding there had not been a sustained attempt to repeatedly go over the information with him. To the extent this has happened, she found there was an improvement in his understanding. She also noted that the defendant's inconsistent responses

can be a sign of malingering and that the amount of effort expended to communicate with Stanley affects the quality of that communication.

The wide variations in Stanley's responses to these experts are not explained by mental retardation. From the testimony, Stanley's limited intellectual abilities, combined with malingering, communication challenges and effort expended are more likely the source of Stanley's difficulties than mental retardation or deafness. No explanation was provided, for instance, for Stanley's affect in the Schmidtgoessling examination, exhibiting a supposed inability to recognize her or, especially, Brian Raven, the interpreter with whom Stanley has worked extensively and whom he has a very concrete relationship. . . .

Stanley's demeanor in court also provides evidence that he is able to comprehend at a level described by Dr. Tanay and not the level he offered to Dr. Schmidtgoessling. The Court viewed the video tape of Stanley's excited reaction to Thrasher's testimony about Stanley's alleged statements to him, in which Stanley loudly stated, and the Court heard, "Bull shit" as the stabbing was described and enacted. The Court also saw, and placed of record, its observations of Stanley's animated communication with family members during a Court recess.

While the defense contends these instances relate to Stanley's ability to communicate regarding concrete matters, the Court also observed Stanley's reactions to more esoteric communication. The Court observed that at the time of Dr. Tanay's testimony regarding the Julius Thrasher testimony, Stanley leaned his head on his hands. This was the only time the Court noticed him make such a gesture. There was at the same time a pronounced change in his demeanor. His reaction was to testimony and not to physical demonstration. This evidenced to the Court that he understood what was being communicated to him concerning Dr. Tanay's testimony.

Moreover, the Court observed that during the testimony of Dr. Tanay, Stanley exhibited a "perplexed expression" when the testimony turned to whether Mr. Stanley had an understanding of what was communicated to him. A similar expression was not exhibited during discussion of other more abstract concepts. Of course, the Court's observations are not scientific. But they fall directly in line with the discrepancies in communication abilities noted, as well as Dr. Schmidtgoessling's recognition that his inconsistent responses can be a sign of malingering.

Mr. Stanley has communication problems because he is prelingually deaf and because he has a lower level of intellectual functioning. The communication problems can be directly affected by the effort expended by those in the communication process. These difficulties do not constitute a mental condition which precludes him from understanding the nature and objective of the proceedings and assisting in his defense. . . . The Court therefore finds that Fred Stanley is COMPETENT to stand trial. Those communicating with Mr. Stanley must take the time and a deliberate approach to effectuate his understanding of the proceedings. Mr. Stanley must also expend effort in this process. Although this process will be time-consuming, the Court will permit a slow pace to accommodate Mr. Stanley's needs.

The Ohio Court of Appeals held that the trial court's decision was "supported by competent, credible evidence." *State v. Stanley,* 700 N.E.2d at 893. It gave great

deference to the trial court's credibility determinations, because "the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections and use these observations in weighing the credibility of the proffered testimony." *Id.* (quoting *Seasons Coal Co. v. City of Cleveland,* 10 Ohio St.3d 77, 461 N.E.2d 1273, 1276 (1984)).

Stanley contends that, considering the evidence, "there is no question that Petitioner demonstrated he was not competent" to stand trial and the state court's finding otherwise was unreasonable. However, Stanley bears a heavy burden in this argument. Under AEDPA, to prevail in this argument he must show that the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Mackey v. Dutton,* 217 F.3d 399, 413 (6th Cir.2000) (applying § 2254(d)'s presumption of correctness to a trial court's competency determination). If a state trial court's competency determination is "fairly supported by the record," it is "entitled to complete deference." *Mackey,* 217 F.3d at 414. This court presumes state court findings of fact are correct unless clear and convincing evidence is offered to rebut this presumption. 28 U.S.C. § 2254(e)(1). This presumption of correctness also applies to the factual findings made by a state appellate court based on the state trial record. *Mason v. Mitchell,* 320 F.3d 604, 614 (6th Cir.2003) (citing *Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)).

A defendant is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and he has a rational and factual understanding of the proceedings against him *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct.

788, 4 L.Ed.2d 824 (1960) (*per curiam*); *accord Drope v. Missouri,* 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975). This standard was incorporated into O.R.C. § 2945.37(G), which states that a defendant is presumed competent to stand trial, unless it is proved by a preponderance of the evidence that "because of [his] present mental condition, [he] is incapable of understanding the nature and objective of · the proceedings against [him] or of presently assisting in [his] defense." We hold that the state court's determination of Stanley's competence is fairly supported by the record. Although there was conflicting expert testimony about his comprehension of court proceedings, there was substantial evidence on which Judge Tracey could base her finding of competence.

Specifically, expert testimony supports findings that Stanley knew he was accused of killing a woman, understood that he could be punished, was able to engage in some meaningful communication with his attorney and with various experts, was able to relate past events, and was able to understand testimony (as demonstrated by his reaction to the interpretation of Thrasher's testimony). The state court concluded that Stanley's difficulties were caused by his "limited intellectual abilities, combined with malingering, communication challenges, and effort expended" but that he was competent to stand trial. As the magistrate judge found, this conclusion was "reasonable in light of the testimony presented at the hearings, petitioner's wide range of responses to the various expert[s'] questions, and the trial court's own observations of petitioner's demeanor and responses to certain testimony elicited at court hearings." The state court employed two interpreters during the trial: one was a hearing person, fluent in sign language, who would communicate what was said to Stanley through a second interpreter who was experienced in commu-

nicating with prelingually deaf individuals such as Stanley. In light of the evidence, it was reasonable for the trial court to conclude that this procedure enabled Stanley to understand the proceedings, to consult with his counsel, and to assist in his defense, and Stanley has not presented clear and convincing evidence to the contrary.

Stanley raises several arguments with respect to the state court's finding of competency. First, he argues that the trial court grossly understated his limitations. He states that his impairment is more severe than mere "limited intellectual ability," and that in fact his intellectual functioning is in the lowest 0.5% of the population. While this is supported by the record, it is also true that Stanley's own experts (who were aware of the 0.5% figure) stated that his intellectual functioning was in the "mildly retarded" range, and Dr. Tanay deemed it to be in the "borderline" range. Judge Tracey described Stanley as having "a lower level of intellectual functioning," and the Ohio Court of Appeals described him as "mildly retarded." Considering this evidence, the state court findings about Stanley's cognitive functioning were not unreasonable. Second, Stanley argues that his own experts were far more qualified than Dr. Tanay, in terms of credentials, experience in dealing with hearing impaired individuals, and experience with Stanley. While that may be true, and while Dr. Vernon in particular has an impressive record of accomplishments, the Ohio Court of Appeals correctly stated that "[a]n expert's credentials may be a factor in a court's determination of the expert's credibility, see, e.g., State v. Hart, 94 Ohio App.3d 665, 641 N.E.2d 755, 763 (1994), but the judge was not required to credit the testimony of one expert over another based solely on credentials." State v. Stanley, 700 N.E.2d at 893.

Third, Stanley argues that Dr. Vernon's testimony that Stanley could understand only two to three percent of the court testimony "directly contradicts the trial court[']s finding ... that 'Petitioner's communication problems could be adequately addressed by both parties expending time and effort in the communication process.'" However, Judge Tracey was presented with substantial evidence contrary to the isolated statement made by Dr. Vernon. This piece of testimony alone does not constitute clear and convincing evidence that the competency finding was incorrect. Stanley's fourth contention, that Judge Tracey erred by not mentioning Dr. Everington's testimony in her opinion, also is not availing. While it would have been preferable for Judge Tracey to reveal how heavily she weighed Everington's testimony, her failure to do so does not merit habeas relief.

Finally, Stanley disputes Dr. Tanay's conclusions in several ways. He argues that Tanay used the wrong definition of competence; gave too much weight to Stanley's knowledge about his family members (because every deaf person knows this type of information); gave too much weight to the fact that Stanley had worked for a time in a grocery store (because Stanley was actually not well-qualified for the job); failed to speak to Stanley's family members, teachers, or trial counsel; and was "obviously biased," because he assumed Stanley's guilt and did not ask about his factual defenses, such as an alibi. These arguments, at best, speak to the probative value of Tanay's opinion, and they amount to a contention that the trial court weighed Tanay's opinion too heavily. It is well-settled, however, that a reviewing court does not second-guess the fact finder's weighing of the evidence. See, e.g., United States v. Ashworth, 836 F.2d 260, 266 (6th Cir.1988). Therefore, these

arguments do not satisfy AEDPA's standard by identifying clear and convincing evidence that the state court unreasonably determined that he was competent to stand trial.

Stanley also argues that the state competency determination "is 'contrary to' clearly established Federal law as determined by the Supreme Court." Stanley claims two errors of law in the competency determination.

First, he argues that "Judge Tracey held that the present mental condition which could be used for a lack of competency was, by statute, mental retardation, as that condition is specifically stated in O.R.C. § 2945.38. This is a narrow and improper reading of the standard for competency." This argument, however, misreads Judge Tracey's opinion. The opinion cites *Dusky*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824, as well as the Ohio statute incorporating *Dusky*'s standard, O.R.C. § 2945.37, and it properly states the standard for competency to stand trial: "it is required that the defendant have sufficient and current ability to consult with his or her lawyer and have a rational and factual understanding of the proceedings against him." It continues:

> The statute clearly anticipates an incompetent determination based on mental retardation under the category of a "present mental condition" as that status is specifically accounted for in R.C. § 2945.38. However, the fact of mental retardation alone does not necessarily render one legally incompetent to stand trial. *See Penry v. Lynaugh*, 492 U.S. 302, 332–334, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989),. This determination

is not the product of a defined equation. Rather it is incumbent upon the Court to consider a number of factors in determining competency, including expert evaluations.

Stanley contends that Judge Tracey stated an intent to consider *only* mental retardation in determining competence, but the language of her opinion does not support that reading. Rather, Judge Tracey properly noted that a determination of incompetency *could be* based on mental retardation, as the statute contemplates. It is clear from the rest of her opinion that she did not limit herself to considering only evidence of Stanley's mental retardation; she also repeatedly made note of his deafness and made extensive findings on his communicative abilities.

Second, Stanley argues that the state court decision was contrary to *Lagway v. Dallman*, 806 F.Supp. 1322 (N.D.Ohio 1992). AEDPA allows this court to grant relief for a state court decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States.*" 28 U.S.C. § 2254(d)(1) (emphasis added). The second clause "limit[s] the area of relevant law" to Supreme Court cases. *Williams*, 529 U.S. at 381. That is, if the Supreme Court "has not broken sufficient legal ground to establish an asked-for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar." *Id.* Thus, Stanley cannot obtain habeas relief by claiming merely that the state court decision was contrary to a federal district court decision.[5]

---

5. In any event, *Lagway* is inapposite to this case. In *Lagway*, the state trial judge ignored all of the evidence presented, which "pointed clearly to incompetence," and instead relied solely on his own unsupported impression

that the defendant was competent. 806 F.Supp. at 1337. *Lagway* stands in stark contrast to the present case, in which the state trial judge weighed voluminous expert testimony from both parties that she considered to

## B. *Miranda* Waiver

■ Stanley next argues that the state court's denial of his motion to suppress his confession involved both unreasonable fact determinations and unreasonable applications of clearly established law. The motion was denied in an oral ruling by Judge Sundermann after an evidentiary hearing. After the mistrial, Stanley filed a motion for reconsideration of Judge Sundermann's ruling, and Judge Tracey denied it without an opinion and without conducting a second hearing. At the evidentiary hearing before Judge Sundermann, held on August 16, 1993, both parties presented extensive evidence about Stanley's understanding of his *Miranda* rights. The court heard the testimony of Ed Zieverink and Dave Feldhaus, Cincinnati police officers who were involved in Stanley's interrogation; Brian Stricker, the officer who communicated in sign language with Stanley; Theresa Smith, a certified sign language interpreter; and Drs. McKay and Everington, psychologists who also testified for Stanley at his second and third competency hearings. The court also reviewed the deposition testimony of Dr. Tanay, who testified for the state at Stanley's second and third competency hearings. In his oral ruling, Judge Sundermann stated that there was conflicting evidence as to Stanley's ability to understand. He noted that "[t]he examining psychiatrists for the State found that they could carry on a conversation with Mr. Stanley through an interpreter," even if it was relatively complex. He referred to testimony that Stanley was selective in what he said he understood, depending on whether it would help his case. Noting that Stanley himself had indicated his understanding of the *Miranda* warnings,

be "professional" and "reliable" and relied minimally and appropriately on her own ob-

Judge Sundermann ruled that Stanley validly waived his *Miranda* rights.

The Ohio Court of Appeals affirmed the ruling after summarizing the evidence this way:

[T]he *Miranda* rights were communicated to appellant by Cincinnati Police Officer Brian Stricker, who used "pidgin" sign language (a method of signing that is a cross between signed English and American Sign Language and includes gestures and miming to communicate information). Because neither the prosecutor, defense counsel nor the trial court [could] understand the information being signed to appellant, the parties relied on the videotape of the exchange between appellant and Officer Stricker as well as testimony from numerous individuals familiar with sign language who had reviewed the videotape.

Several of the individuals familiar with pidgin sign language indicated that Officer Stricker's signing skills were average to poor, and that he failed in several instances to communicate the appropriate information to appellant. For instance, when Officer Stricker meant to sign "You have the right to remain silent," he actually signed "You want the right to remain silent." Some of the signs used by Officer Stricker were not recognizable by many of the individuals familiar with sign.

Finally, several experts in the area of deaf individuals stated that appellant's "yes" responses to Officer Stricker's questions about whether appellant understood the information being conveyed could not be relied upon as an indication that appellant actually understood the information. Many deaf individuals will respond in the positive when asked if

servations of the defendant.

they understand a communication, even if they do not, for fear of appearing slow or stupid. The most effective way to determine whether a deaf individual understands a communication is to ask that person to repeat the information back in his own words. Officer Stricker did not do this.

Officer Stricker testified that he believed that he and appellant were communicating effectively. He based this opinion on the fact that he had spent several hours during the day of the interrogation communicating with appellant on various topics and that appellant's responses were rational and appropriate. Appellant uses a pidgin form of sign language to communicate, which is the same type of sign language with which Officer Stricker was familiar.

Other individuals familiar with sign language reviewed the videotape of the interrogation and stated opinions that the information conveyed by Officer Stricker's sign language was, although not perfect, comprehensible. They also indicated that appellant's demeanor indicated that he understood the information being conveyed to him and that his responses to Officer Stricker were appropriate. After each question, Officer Stricker would ask appellant to respond "yes" or "no," allowing appellant to deny or disaffirm any question or statement by Officer Stricker. Appellant answered "yes" to many questions but also indicated "no" to some questions, which supports the conclusion that he was not merely agreeing with everything Officer Stricker communicated.

Appellant's understanding of the information being given him by Officer Stricker was further demonstrated in the questions that Officer Stricker asked appellant regarding his possible involvement in the death of Thelma Beck. Appellant did not respond with simply "yes" or "no" answers, but provided information to open-ended questions that were appropriate to the questions asked. He also corrected his answers when he realized that he had not understood the question. At one point in the interrogation, appellant was asked whether he had engaged in sex with the victim, and, rather than simply responding "no," appellant stated that he had not, that the victim was old and he was young.

The trial court found that appellant had been effectively advised of his rights to refuse to answer questions and to have an attorney and had knowingly and voluntarily waived those rights. Again, the trial court was faced with contradictory conclusions regarding the information provided and the effectiveness of the communication with appellant. The trial court was forced to credit certain opinions over others and resolve these factual disputes. We hold that the trial court's decision was supported by competent, credible evidence. The videotape of the communication allowed the trial court to observe the demeanor of appellant and to assess the credibility of Officer Stricker's testimony. Several experts, citing specific exchanges on the tape, testified that appellant and Officer Stricker communicated effectively.

*State v. Stanley,* 700 N.E.2d at 896–97.[6]

The trier of fact is to consider whether the totality of circumstances surrounding the interrogation demonstrates that the suspect had the "requisite level of comprehension" of the consequences of the deci-

---

**6.** Another witness, Zieverink, testified that it appeared to him that Stricker and Stanley were able "to communicate back and forth with one another." He observed Stricker's signing of the *Miranda* warnings to Stanley, and said that it appeared to him that Stanley understood what was being communicated. He said, "Basically I was surprised at how

sion to waive his rights. *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Applying this standard and analyzing the evidence, the Ohio Court of Appeals held that there was sufficient evidence to support the finding that Stanley was apprised of his *Miranda* rights and knowingly waived them, such that the confession was properly admitted. *State v. Stanley,* 700 N.E.2d at 897. The district court, following the magistrate's recommendation, held that this determination by the Ohio Court of Appeals was not unreasonable. Stanley argues that he should be granted habeas relief under AEDPA because the state court's *Miranda* determination was based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law (specifically, *Spring* and *Moran*).[7] We reject these arguments.

In *Miranda,* the Supreme Court stated that custodial interrogations are inherently coercive. *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). To combat this and to protect the Fifth Amendment privilege against self-incrimination, *Miranda* set forth procedures through which police officers should apprise defendants of their rights. *Moran,* 475 U.S. at 420. The *Miranda* warn-

ings ensure that a suspect knows of his rights not to talk to the police, to have a lawyer present, and to discontinue talking at any time, as well as ensuring that the suspect is apprised that his statements can be used to secure his conviction. *Id.* A defendant can waive these rights, but *Miranda* requires that the waiver be voluntary, knowing, and intelligent. *Miranda,* 384 U.S. at 444. The test for waiver "has two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Spring,* 479 U.S. at 573 (quoting *Moran,* 475 U.S. at 421). There is no allegation of coercion in this case, and thus no question that Stanley's waiver was voluntary, but he argues that the second *Spring/Moran* dimension was not present. That is, he argues that his waiver was not "made with a

---

fast the two of them could talk because they could talk as fast as you and I, getting into his background information, where he went to school, and et cetera. I was surprised how fast the questions were asked in sign and how fast the responses were in sign."

7. Stanley also argues that the *Miranda* waiver determination was "contrary to" federal law in two ways. The magistrate judge found that the state trial court (Judge Sundermann) misapplied federal law, focusing only on the voluntariness of Stanley's confession and failing to consider whether his waiver was knowing and intelligent. The Ohio Court of Appeals, however, applied the proper standard and concluded that the evidence supported a find-

ing that the waiver was knowing and intelligent. Stanley contends that this was contrary to federal law because "the Court of Appeals did not have the benefit of the witnesses testifying before it to make ... decisions regarding credibility," such that the appeals court could not "cure" the trial court defect. Also, Stanley argues that the Ohio Court of Appeals' statement that "low intellectual functioning does not, by itself, show that a Defendant lacks the ability to comprehend" the *Miranda* warnings was contrary to federal law. Both arguments lack merit and Stanley fails to identify any case to which the Court of Appeals' decision was contrary.

full awareness" of his rights and the consequences of waiving his rights, and that it was unreasonable for the state court to determine otherwise.

As the *Spring* Court explained, a court should consider the "totality of the circumstances" of the interrogation to determine whether the suspect had the requisite level of comprehension. *Id.* The magistrate judge correctly stated that the "totality of the circumstances" includes the background, experience, and conduct of the accused. Also, it was permissible for the state courts to consider evidence adduced at the competency hearings in assessing Stanley's ability to understand the *Miranda* warnings. It is not necessary that a suspect know and understand every possible consequence of a waiver. *Spring*, 479 U.S. at 574 (the "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver"). Thus, when a suspect's voluntary decision to answer police officers' questions is made with "requisite" comprehension of all the information required by *Miranda* (that he has the right to remain silent and to have an attorney present during custodial interrogation, and that his responses to police questioning can be used as evidence against him), his waiver is knowing and intentional under *Miranda. Id.* at 574–75.

Stanley argues that the evidence demonstrates he did not understand the warnings, such that the state courts' determinations otherwise were unreasonable. Stanley relies heavily on the fact that, when Officer Stricker was attempting to check whether Stanley understood his rights, he used only yes/no questions rather than soliciting feedback from Stanley. Witnesses at the competency hearing testified that soliciting feedback is preferred, since an individual who is deaf may respond affirmatively to questions rather than risk looking slow or stupid. Stanley also cites Dr. Vernon's testimony that the

syntax of the *Miranda* warnings (as they are typically issued) is too complicated to be communicated in American Sign Language and that there are words in the warnings (such as "rights") for which there are no signs that an average deaf person would understand. Dr. Vernon testified that Officer Stricker's effort in communicating the warnings was inadequate and could only be understood by a deaf person who, unlike Stanley, was familiar with *Miranda* and could fill in the gaps. Theresa Smith watched the videotape in court and testified about each sign made by Officer Stricker. She stated that some deaf people could understand Stricker's message if they were familiar with *Miranda*, but that Stanley could not. The police officers' testimony that they believed Officer Stricker was effectively communicating with Stanley contradicted the evidence Stanley presented, as did the deposition testimony of Dr. Tanay.

Contrary to Stanley's argument, the Ohio Court of Appeals properly applied the *Spring/Moran* standard and permissibly determined that he waived his *Miranda* rights. This determination is made in light of the "totality of the circumstances," including the evidence presented at the competency hearings that Stanley had the ability to understand abstract concepts such as those in the *Miranda* warnings. Although Stanley has identified evidence that would support his claims, there was also substantial evidence that he understood the warnings. For example, Officer Stricker testified that he and Stanley had communicated for several hours the day he confessed and that during these communications, Stanley provided rational responses to questions and volunteered information. He did not simply answer "yes" to each yes/no question he was asked while being advised of his *Miranda* rights, but rather indicated "no" to some questions, indicating that he was not merely agreeing with everything the officer asked.

As the Ohio Court of Appeals noted, Stanley provided appropriate responses to open-ended questions and corrected his answers when he realized he had misunderstood the question. Facts such as these indicate that Stricker and Stanley were communicating effectively, though imperfectly, during the interrogation and issuance of *Miranda* warnings. The state courts were free to credit expert testimony supporting that conclusion, as well as expert testimony indicating that Stanley was malingering. The state courts were presented with conflicting evidence on the issue of whether Stanley's *Miranda* waiver was knowing, and Stanley has failed to show that their determination was an unreasonable one, as AEDPA requires. Therefore we hold that Stanley's *Miranda* claims do not entitle him to habeas relief.

### III.

For the foregoing reasons, we affirm the denial of habeas relief.

MOORE, Circuit Judge, concurring.

With respect to the *Miranda* issue, the fundamental question in this case is whether the state courts unreasonably determined the facts or unreasonably applied Supreme Court precedent regarding Stanley's purported waiver of his *Miranda* rights. As the majority notes, a *Miranda* waiver "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

There is ample evidence in the record demonstrating that Stanley did not knowingly and intelligently waive his *Miranda* rights. The officer signing the *Miranda* warning (Officer Stricker) had at best limited training in "pidgin" sign language and no relevant experience in signing to a prelingually deaf, retarded person like Stanley, with demonstrated significant communication difficulties. Several witnesses, including Dr. Vernon, Dr. Everington, and Theresa Smith, testified that the *Miranda* warning was not properly conveyed in an understandable way to Stanley and that he did not in fact understand the warning. There are, however, a few shreds of evidence suggesting that Stanley may have understood, such as the self-serving testimony of Officer Stricker that he could communicate with Stanley. Although I believe that the evidence weighs heavily in favor of Stanley's argument that he did not knowingly and intelligently waive his *Miranda* rights as outlined in *Spring* and *Moran,* I cannot say that the determinations of the state courts were "unreasonable" as that term has been defined by the Supreme Court. I am therefore compelled to concur.