Filed 7/27/22  P. v. Lester CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PHILLIP RAY LESTER,<br><br>    Defendant and Appellant. | F079801<br><br>(Super. Ct. No. F19902097)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

Jenny M. Brandt, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Witnesses observed defendant Phillip Ray Lester hit Tauleva Vaielua with a metal baseball bat, causing him to fall to the ground. While Vaielua was still on the ground, defendant hit him again. Vaielua suffered physical injuries from the incident. Defendant claimed he acted out of self-defense because Vaielua had been following defendant with a long metal pole. A jury convicted defendant of assault with a deadly weapon and found true that he inflicted great bodily injury. The trial court imposed the upper term of four years for the assault conviction, plus an additional three years to run consecutively for the great bodily injury enhancement, for a total aggregate term of seven years' imprisonment.

On appeal, defendant, who is deaf, alleges multiple claims of error he asserts are "entwined with [his] disability." He claims the trial court erred by admitting his statement to police following the incident because his waiver made pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) was not knowing, voluntary, and intelligent. Defendant also claims, because he is deaf and was not provided a sign language interpreter during his interrogation, his statement to police was inadmissible under Evidence Code section 754, subdivision (k), and his counsel provided ineffective assistance by failing to object to its admission under this section. (Further undesignated statutory references are to the Evidence Code.) Next, defendant claims the trial court denied him due process and a fair trial when it excluded testimony regarding the circumstances of his statement. Additionally, defendant contends the trial court erred when it refused to instruct the jury with CALCRIM No. 331, as requested by the defense. Last, defendant claims cumulative error warrants reversal of his conviction. After supplemental briefing, the parties agree the matter should be remanded for resentencing under Penal Code section 1170, subdivision (b), as amended by Assembly Bill No. 567 (2021–2022 Reg. Sess.) (Assembly Bill 567).

We agree the matter should be remanded to the trial court for resentencing, but otherwise affirm the judgment.

## FACTUAL BACKGROUND

### *Prosecution evidence*

Two witnesses testified they heard loud noises and observed defendant and Vaielua (described in testimony as the "Hispanic" or "Mexican" man) in the street circling and going back and forth towards each other like they were going to fight. Defendant was holding a baseball bat and Vaielua was holding a long metal pole. Both witnesses saw defendant hit Vaielua with the baseball bat, causing him to fall to the ground. One witness noted defendant hit Vaielua in the head with the baseball bat. The other witness observed Vaielua raise the metal pole and swing it at defendant first. Defendant caught the pole and continued to hit Vaielua with the bat while he was on the ground.

Two video recordings of the incident from two different angles were played for the jury. Both videos show defendant and Vaielua moving around each other and going back and forth towards each other. The videos show Vaielua moving toward defendant, then defendant hitting him on or near his head with the baseball bat, and Vaielua falling to the ground. The videos also show defendant hitting Vaielua again while Vaielua was lying on the ground. Once defendant started hitting Vaielua, witnesses in their vehicles honked their horns and moved forward towards defendant, who stopped.

Vaielua explained that on the day of the incident he was living in a handmade hut, which defendant came over to and destroyed with a bat. Vaielua did not know defendant prior to this incident, never did anything to defendant, and did not know why defendant destroyed his home. When Vaielua told defendant to stop, he did not stop, but instead showed Vaielua his bat like he was going to hit him. Vaielua found a steel pole and picked it up to defend himself. Vaielua then chased defendant down the road for two to five blocks. Vaielua stated he was following defendant because defendant still had the bat and Vaielua was looking for people to call the police; he did not want defendant to hit somebody or to destroy someone else's hut. Vaielua testified that he did not start the

3.

fight. Vaielua admitted that he swung the metal pole at defendant, but stated that it was not to hit him, but to block him and keep him away. According to Vaielua, defendant hit him first, which he blocked with his pole; but the second time defendant hit him, Vaielua fell to the ground.

Vaielua stated he was injured as a result of this incident. He received three separate injuries to his head from being hit by defendant with the bat. Vaielua is now paralyzed on his right side and requires the use of a wheelchair. Vaielua also suffers back pain and groin and leg pain, which he did not have before the incident. At the time of trial, Vaielua was still at the hospital, where he was receiving physical therapy to help him walk.

### Defense evidence

Defendant testified with the assistance of two sign language interpreters. Defendant stated, on the day of the incident, he rode his bicycle to a store and locked it outside with a chain. When he came out of the store, he saw two men, one Mexican and one Black, standing next to his bike. He saw one of them cut the chain on his bike. Defendant followed the two men as they walked away with his bicycle. When he caught up with them, defendant confronted them about his bicycle and tried to take it back, but the Mexican man hit his shoulder with a knife. Defendant said he could not see what the two men were doing because they were blocking him, but he believed it involved drugs. Defendant tried to grab his bicycle, but they pushed him away and the Black man left with his bicycle.

According to defendant, the Mexican man (Vaielua) began facing off with him; moving whenever defendant moved. Vaielua picked up a metal pole and started following him. Because Vaielua had a metal pole, defendant picked up a baseball bat he saw laying around so they would be evenly matched. Defendant left the area, but Vaielua kept coming after him. According to defendant, he was afraid Vaielua was going to try to kill him. Defendant testified Vaielua attacked him first, and defendant defended himself

4.

by grabbing the metal pole and hitting Vaielua with the bat. On cross-examination, defendant added that he thought Vaielua had hit his head on a rock when he fell to the ground. Defendant stated he only hit Vaielua one time. When he saw Vaielua on the ground, defendant became afraid and left him there. Defendant dropped the bat when the police arrived. He told Detective Eric Hull he hit Vaielua only one time and denied telling the detective he hit Vaielua two times.

### *Rebuttal evidence*

Detective Hull testified he interviewed defendant following the incident. Before starting the interview, Detective Hull was informed defendant was deaf and had a hard time communicating with the initial officer. So, Detective Hull communicated with defendant in writing. On a pad of paper, Detective Hull wrote, "My name is Detective Hull, [h]ave you ever been read or read your *Miranda* rights?" Defendant responded in writing back, "Okay, I can understand. I'm deaf mute." Detective Hull wrote out questions with yes or no responses, but some of defendant's responses were short answers as well. Defendant initially told Detective Hull in writing that he hit Vaielua one time, but later told him he hit Vaielua twice. Defendant pointed to his left arm at the upper bicep shoulder area that looked like an older scab that may have been picked. The written communication between Detective Hull and defendant was entered into evidence as People's exhibit 20.

### *Verdict and Sentencing*

The jury deliberated for approximately three days, which included a readback of all the testimony presented at trial. The jury found defendant guilty of assault with a deadly weapon other than a firearm (Pen. Code, § 245, subd. (a)(1)) and found true that he inflicted great bodily injury on Vaielua (*id.*, § 12022.7, subd. (a)). After noting defendant's background included a lengthy criminal history dating back to young adulthood, and consisting of four felony convictions, the trial court imposed the upper

term of four years for the assault conviction, plus three years consecutively for the great bodily injury enhancement, for a total term of seven years in state prison.

## DISCUSSION

### I.      Admission of Defendant's Written Statement Did Not Violate the Fifth and Fourteenth Amendments to the United States Constitution

Defendant contends the trial court erred in admitting his written statements because he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights. Defendant claims the trial court's error in admitting his statements was prejudicial and therefore, his conviction should be reversed. We conclude the statements were properly admitted.

#### A.      Relevant Factual and Procedural History

In pretrial motions in limine, defense counsel requested a section 402 hearing before admitting any statements defendant made to Detective Hull. The court reviewed two videotapes of defendant's interrogation, the transcript of the written communication, and heard testimony from Detective Hull.

Detective Hull testified defendant was under arrest at the time of questioning and not free to leave. While waiting to be interrogated, defendant gestured that he wanted to write. Detective Hull was made aware defendant was deaf; he brought pen and paper in with him to question defendant. Detective Hull was not certified in sign language and did not attempt to get a sign language interpreter for defendant. Detective Hull conducted his interrogation with defendant in writing. He did not ask defendant if defendant was literate. He presumed that when people can write, they can read.

Before the interview began, Detective Hull allowed defendant to read his *Miranda* rights from Detective Hull's department-issued *Miranda* card. The card states: "*Miranda* Warnings: You have the right to remain silent. Anything you say can and may be used against you in court. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will

6.

be appointed to represent you before any questioning if you wish. Do you understand each of these rights I have read to you?"

Detective Hull wrote down a question for defendant on a piece of paper asking if defendant understood his *Miranda* rights. Defendant responded by circling the word "yes" and, according to Detective Hull, affirmatively nodding his head up and down. Detective Hull did not expressly ask defendant if he waived his *Miranda* rights, but, after giving defendant the *Miranda* rights card to read, Detective Hull asked defendant whether he wanted to communicate with him about what happened. A video recording of the interaction between Detective Hull and defendant and the written communication between them were introduced as exhibits at trial. They discussed the incident in the written exchange, which is reflected below:[1]

> "[DETECTIVE:] My name is Detective Hull, have you ever been read or read your *Miranda* rights?
>
> "[DEFENDANT:] Okay I can understand. [¶] I'm deaf mute.
>
> "[DETECTIVE:] I understand. This card is your *Miranda* rights. Do you want to communicate with me about what happened?
>
> "Do you understand each of your *Miranda* rights? Yes or No.
>
> "[DEFENDANT:] [circles 'Yes'] Man say try to kille ne kifne.
>
> "[DETECTIVE:] I watched a video of a man with long hair trying to hit you with a metal pole. Why were you two attacking each other?
>
> "[DEFENDANT:] Men try to store my biker.
>
> "[DETECTIVE:] Stole your bike?
>
> "[DEFENDANT:] Yes.
>
> "[DETECTIVE:] Do you know the other guy you fought?

---

[1]See People's exhibit 20. The original written communication does not distinguish who wrote what. The court adopts the undisputed designation of what defendant and the detective wrote, as set forth in Appellant's Opening Brief and Respondent's Brief.

7.

"[DEFENDANT:]  Yes.

"[DETECTIVE:]  Why was he attacking you?

"[DEFENDANT:]  New my bike from Waltmar.

"[DETECTIVE:]  He only attacked you because your bike was from Wal-Mart?

"[DEFENDANT:]  Yes.  [¶] Men don't keke to [mosgsson bike] meth?  Sell my biker.

"[DETECTIVE:]  I don't understand?  [¶] In the video I watched, I seen you hit the other man with a baseball bat.

"[DEFENDANT:]  Yes.

"[DETECTIVE:]  Why did you hit the other man with the bat?  How many times did you hit him with the bat?

"[DEFENDANT:] 1  Kill to me.

"[DETECTIVE:]  You're saying the other man threatened to kill you?

"[DEFENDANT:]  Yes.

"[DETECTIVE:]  What exactly was the threat?  What did he say?

"[DEFENDANT:]  No I don't know about [for] him.

"[DETECTIVE:]  What word is this? [pointing to bracketed word above]

"[DEFENDANT:]  For.

"[DETECTIVE:]  In the video I watched, it appeared that you hit the other man on the head with the baseball bat 2 or 3 times while he was on the ground.

"[DEFENDANT:]  2.

"[DETECTIVE]:  So you are now saying you hit him twice with the bat?  Earlier you stated it was only one time.  Are you being entirely truthful?

"[DEFENDANT:]  No.

"[DETECTIVE:] What it is you are not being truthful about?

"[DEFENDANT:] Ok.

"[DETECTIVE:] Do you regret hitting that man with a baseball bat?

"[DEFENDANT:] Yes.

"[DETECTIVE:] If you could go back and change what happened today, would you have walked away or did exactly what you did?

"[DEFENDANT:] No.

"[DETECTIVE:] So you would have walked away?

"[DEFENDANT:] Yes.

"[DETECTIVE:] Are you sorry?

"[DEFENDANT:] Ok.

"[DETECTIVE:] Yes or no?

"[DEFENDANT:] [circles 'No']

"[DETECTIVE:] So are you okay with hitting another person 3 times on the head with a baseball bat?

"[DEFENDANT:] Yes.

"[DETECTIVE:] Do you consider yourself a violent person?

"[DEFENDANT:] No.

"[DETECTIVE:] If you could apologize to the man you hit with the bat, would you?

"[DEFENDANT:] Yes.

"[DETECTIVE:] The first hit, I understand. But, the two hits while he was on the ground seemed to be excessive. What do you think?

"[DEFENDANT:] Yes."

Defense counsel contended once defendant wrote he is deaf and mute, "the appropriate response would be to get an interpreter." He noted the questions were "yes" or "no."

After the court watched video footage of the exchange, it explained its primary concern was whether or not the *Miranda* rights were properly administered and if there was a knowing and willing express waiver or agreement to communicate with the detective. The court explained it "actually also heard the word 'yes' or 'yeah'" come from defendant in the video. The court noted, "[i]t might not be the clearest of the yeses, but there was a definite affirmative response verbalized." The court further noted, defendant was making other sounds and pointing to his arm.

Accordingly, the court concluded defendant's *Miranda* "rights were given to him. I observed him actually looking at those rights attentively, and he looked at them again when the officer pointed to it one more time. He started writing and [it] appears he wrote the words you say that are on the exhibit. And then the officer further wrote down the communication with him about what happened, and then I observed [defendant] in that video circle, that very first circle that's on this document."

Defense counsel asserted, "The problem is we don't know what part he's saying yes to or no to. He can't verbalize … or explain or say, 'I'm confused. I don't understand this part of the question' or 'that part of the question.' [¶] [H]e can try to mumble and be cooperative as he can with law enforcement, but … we don't know what he's saying yes or no to, because we don't even know if he's literate."

The court reiterated its finding the *Miranda* warnings were properly administered. It advised defense counsel the issue could be revisited if and when the evidence was introduced if counsel became aware of additional pertinent authority.

### B. Standard of Review and Applicable Law

"The Fifth Amendment to the United States Constitution, which applies to the states by virtue of the Fourteenth Amendment, provides that no person may be compelled to be a witness against himself or herself." (*People v. Linton* (2013) 56 Cal.4th 1146, 1170–1171; accord, *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1127.) In *Miranda*, *supra*, 384 U.S. 436, the high court "'adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation.'" (*Linton*, *supra*, at p. 1171, quoting *Maryland v. Shatzer* (2010) 559 U.S. 98, 103; see *Miranda*, *supra*, at p. 479; *People v. Jackson* (2016) 1 Cal.5th 269, 338–339.) Pursuant to *Miranda*, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda*, *supra*, at p. 479.)

It is well settled that after a suspect hears and understands these rights, he or she may waive them. (*Maryland v. Shatzer*, *supra*, 559 U.S. at p. 104; *Miranda*, *supra*, 384 U.S. at p. 475; *People v. Leon* (2020) 8 Cal.5th 831, 843; *People v. Linton*, *supra*, 56 Cal.4th at p. 1171; *People v. Tate* (2010) 49 Cal.4th 635, 683.) To establish a valid *Miranda* waiver, the prosecution bears the burden of establishing by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary under the totality of the circumstances of the interrogation. (*Maryland v. Shatzer*, *supra*, at p. 104; *Moran v. Burbine* (1986) 475 U.S. 412, 421; *Leon*, *supra*, at p. 843; *Linton*, *supra*, at p. 1171; *People v. Williams* (2010) 49 Cal.4th 405, 425.)

The question of whether a valid *Miranda* waiver was given must be determined on "'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" (*North Carolina v. Butler* (1979) 441 U.S. 369, 374–375, quoting *Johnson v. Zerbst* (1938) 304 U.S. 458, 464; see *United States v.*

11.

*Washington* (1977) 431 U.S. 181, 188.)  Language difficulties encountered by a defendant during custodial interrogation are "one factor" to be considered in determining whether a defendant knowingly and intelligently waived his or her *Miranda* rights.  (*U.S. v. Garibay* (9th Cir. 1998) 143 F.3d 534, 537.)

The waiver need not be an express waiver but may be implied from words and action.  (See *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384–385 [no formalistic waiver procedure required in order to relinquish *Miranda* rights]; *North Carolina v. Butler*, *supra*, 441 U.S. at pp. 373, 375–376 [explicit waiver not required to find defendant waived *Miranda* rights].)  Where the prosecution shows a *Miranda* warning was given and was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.  (*Berghuis*, *supra*, 560 U.S. at p. 384.)  The Supreme Court has never required *Miranda* warnings be given in any particular form or manner.  (See, e.g., *Missouri v. Seibert* (2004) 542 U.S. 600, 611; *Duckworth v. Eagan* (1989) 492 U.S. 195, 202; *California v. Prysock* (1981) 453 U.S. 355, 359; *Berghuis*, *supra*, at p. 385.)

In assessing the validity of a waiver of *Miranda* rights, a reviewing court must "conduct an independent review of the trial court's legal determination" of whether the *Miranda* waiver was voluntary, knowing, and intelligent under the totality of circumstances surrounding the interrogation.  (*People v. Williams*, *supra*, 49 Cal.4th at p. 425; see *People v. Whitson* (1998) 17 Cal.4th 229, 236.)  By its nature, this standard of review is not deferential "to a trial court's granting or denial of a motion to suppress a statement under *Miranda* insofar as the trial court's underlying decision entails a measurement of the facts against the law."  (*People v. Waidla* (2000) 22 Cal.4th 690, 730; see *People v. McWhorter* (2009) 47 Cal.4th 318, 346 [independent review of trial court's determination regarding *Miranda*].)

In reviewing defendant's claim that his *Miranda* rights were violated, we accept the trial court's resolution of disputed facts and inferences, as well as its evaluation of the

12.

credibility of witnesses, where supported by substantial evidence. (*People v. Leon*, *supra*, 8 Cal.5th at p. 843; *People v. Case* (2018) 5 Cal.5th 1, 20; *People v. Duff* (2014) 58 Cal.4th 527, 551; *People v. Hensley* (2014) 59 Cal.4th 788, 809 [reviewing court accepts trial court's determination of disputed facts if supported by substantial evidence]; *People v. Dykes* (2009) 46 Cal.4th 731, 751; *People v. Davis* (2009) 46 Cal.4th 539, 586; *People v. Cruz* (2008) 44 Cal.4th 636, 667; *People v. Wash* (1993) 6 Cal.4th 215, 235; *People v. Kelly* (1990) 51 Cal.3d 931, 947.) " " " "We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." " " [Citations.]'" (*Leon*, *supra*, at p. 843; see *Duff*, *supra*, at p. 551.)

Any erroneous admission of statements obtained in violation of *Miranda* are reviewed for prejudice pursuant to *Chapman v. California* (1967) 386 U.S. 18. Under the *Chapman* standard, the reviewing court inquires whether the error may be deemed harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310; *People v. Cunningham* (2001) 25 Cal.4th 926, 994; *Chapman*, *supra*, at p. 24 [the remaining evidence must establish guilt beyond a reasonable doubt].)

### C.     Analysis

Defendant contends he did not knowingly, voluntarily and intelligently waive his *Miranda* rights. Defendant argues Detective Hull failed to obtain the assistance of a sign language interpreter, even though Detective Hull knew he was deaf and mute, and instead, chose to conduct the interrogation in writing. Defendant contends his *Miranda* waiver is invalid because it was not clear he was literate and able to understand the written *Miranda* advisement. In support, defendant argues his responses to Detective Hull's questions were often unintelligible and nonsensical, demonstrating that he could not have understood his *Miranda* rights. As such, defendant claims his *Miranda* rights were not properly waived, and therefore, his written statements to Detective Hull should

13.

have been suppressed.  Defendant contends such error was prejudicial and his conviction should be reversed.

Here, based upon our independent review of the totality of the circumstances surrounding the interrogation, we conclude the record supports a finding defendant was sufficiently able to understand, and he knowingly, voluntarily, and intelligently waived his *Miranda* rights.[2]  (See *Maryland v. Shatzer*, *supra*, 559 U.S. at p. 104; *Moran v. Burbine*, *supra*, 475 U.S. at p. 421; *People v. Leon*, *supra*, 8 Cal.5th at p. 843; *People v. Linton*, *supra*, 56 Cal.4th at p. 1171; *People v. Williams*, *supra*, 49 Cal.4th at p. 425.)  In the video recording, before his interview with Detective Hull began, defendant appears to gesture he wanted something with which to write.  After Detective Hull wrote his first question to defendant asking if defendant had ever been read his *Miranda* rights, defendant responded in writing that he could understand.  Detective Hull then handed defendant the card containing the *Miranda* advisements.  Defendant can be seen on the video looking at the card.  Then, after looking at the card, defendant circled "yes," responding to whether he understood his *Miranda* rights and made an audible sound when Detective Hull pointed to the question.  Although defendant misspelled some words and had poor grammar, his written answers were generally responsive to the written questions.  Notably, Detective Hull asked defendant what a specific word was and defendant was able to clarify it by writing "for," demonstrating he had at least some ability to read and understand what Detective Hull wrote.  On this record, we conclude the facts and circumstances demonstrate defendant was sufficiently able to read and understand his *Miranda* rights.  (See *U.S. v. Bernard S.* (9th Cir. 1986) 795 F.2d 749, 753 [concluding defendant voluntarily, knowingly and intelligently waived *Miranda* rights where rights were read and explained to him; he stated he understood each right and

---

[2]Since Detective Hull's interrogation of defendant was recorded, the facts surrounding his written statements are undisputed and we apply an independent review. (*People v. Leon*, *supra*, 8 Cal.5th at p. 843; *People v. Duff*, *supra*, 58 Cal.4th at p. 551.)

signed a written waiver; and he answered questions in English "and at no time indicated that he did not understand what was being said to him"]; *U.S. v. Martinez* (9th Cir. 1978) 588 F.2d 1227, 1234–1235 [noting defendant's contention he did not understand *Miranda* warnings given in different Spanish dialect was "seriously weakened" by fact he continued to converse with officer who read him warnings]; *U.S. v. Gonzales* (9th Cir. 1984) 749 F.2d 1329, 1336 [evidence supported conclusion defendant knowingly and intelligently waived *Miranda* rights where he was read his rights, appeared to understand them, read and signed cards explaining his rights in two languages, and continued to converse with officer thereafter]; *People v. Debouver* (2016) 1 Cal.App.5th 972, 978 [voluntary and knowing *Miranda* waiver where defendant signed *Miranda* waiver, provided written statement, and answers were responsive to questions asked].) Additionally, defendant's lengthy criminal history also supports an inference he was familiar with, understood, and knowingly and intelligently waived his *Miranda* rights. (See *People v. Lessie* (2010) 47 Cal.4th 1152, 1169 [evidence supported finding defendant knowingly and voluntarily waived *Miranda* rights where nothing in record suggested defendant did not understand them and noting defendant "was no stranger to the justice system"]; *Debouver*, *supra*, at p. 978 [defendant's familiarity with law enforcement and experience with criminal justice system supported finding of voluntary and knowing *Miranda* waiver]; see generally *North Carolina v. Butler*, *supra*, 441 U.S. at pp. 374–375 ["'the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused'"]; *People v. Mosby* (2004) 33 Cal.4th 353, 365 ["'a defendant's prior experience with the criminal justice system' is, as the United States Supreme Court has concluded, 'relevant to the question [of] whether he knowingly waived constitutional rights'"].)

A suspect's expressed willingness to answer questions after acknowledging an understanding of his *Miranda* rights has itself been held sufficient to constitute an

implied waiver of such rights.  (*People v. Cruz*, *supra*, 44 Cal.4th at p. 667, citing *People v. Medina* (1995) 11 Cal.4th 694, 752; *People v. Sully* (1991) 53 Cal.3d 1195, 1233.) Although Detective Hull did not specifically ask defendant if he waived his *Miranda* rights, a suspect who desires to waive his *Miranda* rights and submit to law enforcement interrogation need not do so with any particular words or phrases.  (See *Cruz*, *supra*, at p. 667; see also *North Carolina v. Butler*, *supra*, 441 U.S. at p. 373.)  Here, there is nothing in the record indicating that defendant's statement was coerced or involuntary.  (See *Moran v. Burbine*, *supra*, 475 U.S. at p. 421 [waiver was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception].)  Instead, defendant acknowledged he understood his *Miranda* rights and demonstrated his willingness to waive those rights and answer questions by nodding his head in affirmation, circling "yes" to the question if he wished to communicate, and by then willingly responding to Detective Hull's written questions.  Given "'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused'" (*North Carolina v. Butler*, *supra*, at p. 374), we find that, while defendant did not expressly waive his *Miranda* rights, he did so implicitly by nodding affirmatively, and "by willingly answering questions after acknowledging that he understood those rights" (*People v. Lessie*, *supra*, 47 Cal.4th at p. 1169).

While it would have been better practice to use a sign language interpreter to convey the *Miranda* warnings to a suspect who is deaf, we are aware of no authority for the proposition that, as a matter of constitutional law, one is always required.  Rather, courts in other jurisdictions have considered the issue on a case-by-case basis.  (See, e.g., *People v. Brannon* (Mich.Ct.App. 1992) 194 Mich.App. 121, 129–130 [486 N.W.2d 83, 87–88] [finding valid waiver where warnings were provided to hearing-impaired defendant in written form]; *State v. Perry* (Tenn.Crim.App. 1999) 13 S.W.3d 724, 739 [finding valid waiver by deaf defendant where no sign language interpreter was used, but the defendant understood the written word]; see also *Stanley v. Lazaroff* (6th Cir. 2003)

82 Fed.Appx. 407, 420–422 [finding valid waiver where officer communicated warnings to hearing-impaired defendant in "pidgin" sign language]; *People v. McBride* (Mich. 2008) 480 Mich. 1047, revg. (Mich.Ct.App. 2006) 273 Mich.App. 238 [729 N.W.2d 551] [finding hearing-impaired defendant validly waived her *Miranda* rights by signing a written form, even though the sign language interpreter did not explain the form].)

Although defendant argues English and American Sign Language are two separate languages, courts have found valid *Miranda* waivers even when the warnings were not communicated in the defendant's primary language where the circumstances indicate the suspect understood his rights. (See *Companeria v. Reid* (2d Cir. 1989) 891 F.2d 1014, 1020 ["Even though [defendant's] proficiency in the English language may have been limited, it did not prevent him from making a knowing and intelligent waiver of his constitutional rights"]; *U.S. v. Bernard S.*, *supra*, 795 F.2d at p. 752; *U.S. v. Gonzales*, *supra*, 749 F.2d at p. 1336 [evidence demonstrated the non-Spanish-speaking officer and the Spanish-speaking defendant understood each other].) Any language difficulties encountered by a defendant are considered as a factor in determining if there has been a valid waiver. (*U.S. v. Bernard S.*, *supra*, at pp. 751–752; see *U.S. v. Heredia-Fernandez* (9th Cir. 1985) 756 F.2d 1412, 1415; see also *U.S. v. Martinez* (9th Cir. 1978) 588 F.2d 1227, 1234–1235 [argument *Miranda* warnings were inadequate due to different dialect of Spanish were weakened by evidence defendant continued to converse with the officer who read him the warnings]; *U.S. v. Gonzales*, *supra*, at pp. 1335–1336 [reviewing language difficulties in determining whether waiver was valid].) Here, however, the facts and circumstances, as discussed *ante*, show defendant understood the written communication with Detective Hull and continued to communicate with him in writing. Therefore, there was no evidence of any language difficulty substantial enough to invalidate the *Miranda* waiver.

Although defendant argues the detective did nothing to determine whether defendant was literate, Detective Hull testified he assumed defendant was literate since

he was able to read the questions and provide written answers. Defendant himself wrote "I can understand," in response to Detective Hull's first written question. Defendant also took his time looking at the *Miranda* card, and for the most part, was able to provide responsive answers to Detective Hull's written questions. Even considering there were grammatically poor responses, defendant was able to provide clarification on the word "for" when Detective Hull asked what the word was, supporting an inference he understood what Detective Hull wrote. Thus, we find no indication Detective Hull sought to take advantage of defendant by communicating the warnings in written form rather than using a sign language interpreter. (See *Rice v. Cooper* (7th Cir. 1998) 148 F.3d 747, 750 [where police have no reason to think the suspect does not understand, there is nothing that smacks of abusive behavior.].)

The cases defendant cites in support of his argument are inapposite. First, *People v. Barajas* (1978) 81 Cal.App.3d 999 is unrelated as it does not involve *Miranda*, but whether unintelligent and inaudible portions of a tape recording could be admitted into evidence. (*Barajas*, *supra*, at p. 1012.) *People v. Salas* (1978) 77 Cal.App.3d 600 is also irrelevant as it concerns a motion made pursuant to *Faretta v. California* (1975) 422 U.S. 806 and the defendant's constitutional right to represent himself. Additionally, the facts in *U.S. v. Garibay*, *supra*, 143 F.3d 534 and *Gov't of Canal Zone v. Gomez* (5th Cir. 1978) 566 F.2d 1289 are factually distinguishable from the present case. In *Garibay*, the defendant was mainly Spanish speaking, but the agent assumed he was sufficiently proficient in English to understand and waive his *Miranda* rights. The defendant's inability to understand the oral instructions, coupled with his low IQ, established he could not have knowingly and intelligently waived his *Miranda* rights. (*Garibay*, *supra*, at pp. 537–538.) Here, unlike in *Garibay*, Detective Hull knew defendant was deaf and accommodated him by using written communication. And there was no evidence introduced at trial regarding defendant's intelligence level, other than what could be inferred from his written statements. In *Gomez*, the *Miranda* waiver was deemed not

knowing or intelligent because the defendant was unable to read or write or speak English, and he was from another country and unfamiliar with our laws. (*Gomez*, *supra*, at p. 1292.) Here, unlike in *Gomez*, defendant never testified he could not read or write, video evidence shows defendant appearing to read the *Miranda* card and writing his own responses, and because of his criminal history, defendant was familiar with our criminal process.

Rather, this case is more like the facts in *Stanley v. Lazaroff*, *supra*, 82 Fed.Appx. 407, where the defendant was deaf but able to communicate with the police officer in writing. The *Stanley* court found the defendant's demeanor indicated he understood the information being conveyed to him and that his written responses to the officer were appropriate. The *Stanley* court noted the defendant answered each question and that not every question was answered with a "yes," as the defense suggested was part of deaf culture. Instead, the defendant also answered "no" to some questions, which supported the conclusion he was not merely agreeing with everything the officer communicated. (*Id.* at p. 420.) Similarly, here, defendant was able to provide short sentence written responses to the detective's written questions, as well as both "yes" and "no" responses, contradicting defendant's assertion his "yes" answers are just part of deaf culture, even when yes is not meant. (See *ibid.*) We note defendant's demeanor also reflected he understood and was willing to communicate: he used gestures to indicate he wanted to use pen and paper to communicate, nodded his head in affirmation, and wrote his own short sentence responses. (See *ibid.*) Like in *Stanley*, defendant and the detective were communicating effectively, even if imperfectly, during the interrogation and issuance of the *Miranda* warnings, which sufficiently demonstrated he understood his *Miranda* rights and his waiver was valid. (*Stanley*, *supra*, at p. 423.)

The circumstances sufficiently establish defendant understood his *Miranda* rights and knowingly, voluntarily, and intelligently chose not to exercise his right to remain silent. (See, e.g., *People v. Parker* (2017) 2 Cal.5th 1184, 1216; *People v. Cruz*, *supra*,

44 Cal.4th at pp. 668–669; *People v. Sully*, *supra*, 53 Cal.3d at p. 1233; *People v. Davis*, *supra*, 29 Cal.3d at pp. 823–826; *Stanley v. Lazaroff*, *supra*, 82 Fed.Appx. at p. 423.) Therefore, we conclude the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension to demonstrate defendant validly waived his *Miranda* rights. (See *Colorado v. Spring* (1987) 479 U.S. 564, 573; *Moran v. Burbine*, *supra*, 475 U.S. at p. 421; see, e.g., *Parker*, *supra*, at p. 1216.)

Regardless, even assuming a *Miranda* violation occurred, defendant's statements were nonetheless admissible for impeachment purposes. The United States Supreme Court in *Harris v. New York* (1971) 401 U.S. 222 (*Harris*) decided that a statement taken in violation of *Miranda* is inadmissible at trial in the prosecution's case-in-chief but is admissible to impeach the defendant's credibility as a witness, so long as the statement otherwise is voluntary. (*Harris*, at pp. 225–226; accord, *Oregon v. Hass* (1975) 420 U.S. 714, 723–724 [a statement taken after the police fail to honor the suspect's invocation of the right to counsel during interrogation is admissible for impeachment purposes]; *People v. Hoyt* (2020) 8 Cal.5th 892, 970; *People v. Demetrulias* (2006) 39 Cal.4th 1, 29–30; *People v. Peevy* (1998) 17 Cal.4th 1184, 1188 [statement taken in violation of *Miranda* is otherwise admissible to impeach the defendant's credibility as a witness].) Under our California Constitution, statements taken in violation of *Miranda* are to be excluded from evidence only to the extent required by the federal Constitution, thus we are bound to apply the rules established in *Harris* and its progeny. (Cal. Const., art. I, § 28, subd. (d); *Peevy*, *supra*, at p. 1188; *People v. May* (1988) 44 Cal.3d 309, 315.) Here, defendant's postarrest statements were not introduced during the People's case-in-chief but only after defendant took the stand and gave conflicting testimony regarding the number of times he hit Vaielua. Therefore, even if there had been a *Miranda* violation, defendant's written statements were admissible for impeachment purposes under *Harris*.[3]

---

[3]Defense counsel's ex parte application to expand the scope of appointment to include preparation and filing of a petition for writ of habeas corpus and for an order authorizing funds to

**II. Defendant Forfeited His Claim Under Section 754, Subdivision (k), and Fails to Demonstrate His Counsel Provided Ineffective Assistance by Failing to Object to the Admission of Defendant's Statement under Section 754, Subdivision (k)**

Defendant next claims, because the police did not use a sign language interpreter when they interrogated him, even though they knew he was deaf, his statement was inadmissible at trial under section 754, subdivision (k). Defendant also claims he received ineffective assistance of counsel for his attorney's failure to object to the admission of his statement under section 754, in violation of the Sixth and Fourteenth Amendments of the United Stated Constitution. We find no error.

**A. Relevant Factual Background**

During the section 402 hearing, defense counsel argued his written statements should be suppressed because he should have been given a sign language interpreter during police interrogation. However, when asked for authority by the trial court, he failed to cite any case law or authority that supported his position.

**B. Standard of Review and Applicable Law**

*1. Section 754*

Section 754, subdivision (k) states that "[a] statement, written or oral, made by an individual who the court finds is deaf or hard of hearing in reply to a question of a peace officer, or any other person having a law enforcement or prosecutorial function in a

---

hire an expert is denied. Counsel asserts "the basis of the habeas petition would be that because trial counsel did seek to suppress [defendant's] statement on the basis that he was illiterate and unable to understand the admonishment regarding his Fifth Amendment rights, because an expert's evaluation and opinion could have changed the trial court's decision as to whether to admit the statement, and because the admitted statement was prejudicial, trial counsel violated [defendant's] Sixth and Fourteenth Amendment rights to the effective assistance of counsel." Counsel alleges defendant could not "present the instant claim via his direct appeal because it relies on materials outside of the record," including defendant's school records, declarations from experts in deaf literacy and interactions with police, and statements from trial counsel regarding his reasons for not calling an expert to testify at trial. However, as the court has concluded, even if there was a *Miranda* violation, defendant's statements were admissible for impeachment purposes under *Harris*. Therefore, the court denies counsel's ex parte application to expand the scope of appointment to file the petition for writ of habeas corpus.

criminal or quasi-criminal investigation or proceeding, shall not be used against that individual who is deaf or hard of hearing unless the question was accurately interpreted and the statement was made knowingly, voluntarily, and intelligently and was accurately interpreted, or the court finds that either the individual could not have used an interpreter or an interpreter was not otherwise required by Title II of the federal Americans with Disabilities Act of 1990 (Public Law 101-336) and federal regulations adopted thereunder and that the statement was made knowingly, voluntarily, and intelligently."

### 2.    *Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel, the defendant must show counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and this conduct was prejudicial to his case, that is, there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694 (*Strickland*).)

In evaluating trial counsel's actions, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland*, *supra*, 466 U.S. at p. 689; see *People v. Dennis* (1998) 17 Cal.4th 468, 541.) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances.  (*Strickland*, *supra*, at p. 689; *People v. Dennis*, *supra*, at p. 541.)  "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)  On direct appeal, when no explanation for counsel's conduct can be found in the record, "we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation."  (*People v. Scott* (1997) 15 Cal.4th 1188, 1212; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1053.)

In considering a claim of ineffective assistance of counsel, it is not necessary to determine "'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. … If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland*, *supra*, 466 U.S. at p. 697; *In re Cox* (2003) 30 Cal.4th 974, 1019 [same].) To prevail on an ineffective assistance of counsel claim, the defendant must demonstrate a "reasonable probability" that absent the errors the result would have been different. (*People v. Williams* (1997) 16 Cal.4th 153, 215; *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, at p. 694; see *Ledesma*, *supra*, at p. 218.)

### C. Analysis

Initially we note defense counsel failed to object to the admission of defendant's statement under section 754. Therefore, the claim that defendant's statements should have been excluded under this section is forfeited. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 721; *People v. Partida* (2005) 37 Cal.4th 428, 433–434.)

Nor can we conclude defendant has overcome the strong presumption defense counsel's failure to object on this basis fell outside the wide range of reasonable professional assistance. Counsel in this case was not asked for an explanation regarding why he did not object to the admissibility of defendant's statement under section 754. And it is possible counsel's failure to object was a tactical decision because he did not believe such a motion had merit. (See *People v. Ochoa*, *supra*, 19 Cal.4th at p. 463 ["Representation does not become deficient for failing to make meritless objections"]; *People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective

assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)

As discussed above, the court had already concluded defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights, and his subsequent statements were admissible on that basis. Defense counsel could have reasonably believed the court's holding suggested it did not believe an interpreter was otherwise required by the federal Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.) (ADA) and thus, the court would have held the statement admissible under section 754. Consequently, defendant fails to demonstrate he received ineffective assistance of counsel for not objecting to the admission of his statement under section 754. (See *People v. Boyette* (2002) 29 Cal.4th 381, 437 [counsel not ineffective for not making a futile objection].)

Even if trial counsel erred by not objecting to the admission of defendant's written statement under section 754, subdivision (k), defendant fails to demonstrate he was prejudiced as a result. Assuming, arguendo, that the trial court would have sustained counsel's objection to the evidence, here, the People's case comprised testimony from the victim, two eyewitnesses who observed defendant hitting Vaielua with the baseball bat after he had fallen to the ground, and video evidence recording the incident showing defendant hitting Vaielua after he was on the ground. (See *Strickland*, *supra*, 466 U.S. at p. 695 [in assessing prejudice, the court must consider the totality of the evidence].) And although defendant argues his written statements are prejudicial, in them, defendant also suggested to the detective that he acted in self-defense, thus supporting his theory of self-defense. Further, defendant testified at trial and admitted he hit Vaielua with a baseball bat, reducing potential prejudice and alleged inflammatory impact of his written statements. Accordingly, we cannot conclude there is a reasonable probability defendant would have obtained a more favorable result even if counsel had objected and the court excluded his prior statement on this basis. (See *Strickland*, *supra*, at p. 700 ["Failure to

24.

make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim"]; see also *People v. Jennings* (1991) 53 Cal.3d 334, 357.)

In so concluding, we do not agree with defendant that the time the jury spent deliberating necessarily demonstrates a close call in the case. First, there was no evidence the jury was ever unable to reach a verdict. (See *People v. Walker* (1995) 31 Cal.App.4th 432, 438 [no evidence during deliberation that jury was unable to reach a verdict].) Additionally, the jury requested a readback of all the witness testimony, which took time for the court reporter to prepare and then to read. (See *ibid*. [time spent listening to readback of witnesses' testimonies should not be included in the time calculated for deliberations].) While in some cases our Supreme Court has inferred a close case from unduly lengthy deliberations, we cannot do so under the facts of this case, which would require more concrete evidence. (See *id*. at pp. 438–439; e.g., *In re Martin* (1987) 44 Cal.3d 1, 51.) Instead, we conclude the length of the deliberations may be reconciled with the jury's conscientious performance of its civic duty, rather than its difficulty in reaching a decision. (See *Walker*, *supra*, at p. 439; *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 863.)

In sum, even if defendant's statements to Detective Hull had been excluded, it is not reasonably probable the result would have been different. (See *People v. Williams*, *supra*, 16 Cal.4th at p. 215; *People v. Ledesma*, *supra*, 43 Cal.3d at pp. 217–218; *People v. Mesa*, *supra*, 144 Cal.App.4th at p. 1008.) Consequently, defendant cannot establish a claim of ineffective assistance of counsel. (See *Strickland*, *supra*, 466 U.S. at p. 697; *Williams*, *supra*, at p. 215; *Ledesma*, *supra*, at pp. 217–218; *Mesa*, *supra*, at p. 1008.)

## III. The Trial Court Did Not Err by Excluding Testimony Regarding Defendant's Education Level and Language Barriers.

Defendant complains the trial court erroneously excluded evidence about his education level and language barriers, which he states would have allowed the jury to fully evaluate the reliability and accuracy of defendant's statement to police. Defendant

claims the evidence should not have been excluded because it was relevant and probative, with minimal chance to prejudice the jury. Defendant contends that excluding this evidence was prejudicial error, requiring reversal of his conviction. We find no error.

### A. Relevant Procedural History

On cross-examination, the People asked defendant if he "remember[ed] speaking to an officer after [he was] arrested on March 26th, 2019?" He replied "Yes. I can't believe—I couldn't—I said I was deaf. I couldn't understand any written communication." The People objected as nonresponsive, the trial court sustained the objection and struck the answer. During defense counsel's cross-examination of Detective Hull, the following colloquy took place:

> "[DEFENSE COUNSEL]: Q And are you aware [defendant] was a deaf mute?
>
> "[DETECTIVE HULL:] A Yes. That was the first thing he wrote to me.
>
> "Q Are you aware of a lot of deaf mutes are illiterate?
>
> "[THE PROSECUTOR]: Objection. Counsel is testifying. Motion in limine.
>
> "THE COURT: Just one moment. The objection is sustained. Counsel, pose a question if you are asking for foundational question.
>
> "[DEFENSE COUNSEL]: Q You mentioned earlier that the way you communicate with my client was written yes or no questions; is that correct?
>
> "A I asked him yes or no questions. However his responses were short sentences as well. Not just yes or no.
>
> "Q Did you ask if my client graduated from the 12th grade?
>
> "[THE PROSECUTOR]: Objection, relevance. Beyond the scope.
>
> "THE COURT: Sustained.

26.

"[DEFENSE COUNSEL]: Q Did you ask my client his educational level?

"[THE PROSECUTOR]: Objection, relevance. Beyond the scope.

"THE COURT: On the beyond the scope, it's sustained. So would you like to have a side bar, [defense counsel]?

"[DEFENSE COUNSEL]: Yes, Your Honor.

"THE COURT: Be right back, folks. [¶] (Thereupon a brief conference was held in the hallway, unreported.)"

Back on the record, defense counsel's cross-examination continued:

"Q Did you ever call for a sign language interpreter?

"A No.

"[THE PROSECUTOR]: Objection, relevance. Motion in limine.

"THE COURT: Sustained.

"[THE PROSECUTOR]: Move to strike.

"THE COURT: Stricken.

"[DEFENSE COUNSEL]: Q Are you familiar with the Americans with Disability Act?

"[THE PROSECUTOR]: Objection. Calls for—

"THE COURT: Sustained.

"[DEFENSE COUNSEL]: Q What reasonable accommodations were made for a 61 year old deaf mute?

"[THE PROSECUTOR]: Objection, relevance.

"THE COURT: Counsel, let me see you side bar again, please. [¶] (Thereupon a brief conference was held in the hallway, unreported.)

"THE COURT: Back on the record again. Status quo remains. The last objection is sustained. And any answers are stricken if there was any. You may continue with your questioning, sir."

In a subsequent conference outside the presence of the jury, the following discussion occurred:

"[THE COURT:] Subsequently, in the most recent side bars there were concerns raised by the People as to [defense counsel]'s cross-examination of Detective Hull specifically related to what appeared to be improper questioning based on [defendant's] inability to properly identify or understand what was being said or done, which effectively suggests to the Court there was a *Miranda* violation legal ground objection. Those words were not uttered in front of the jurors, but that's how I read that. That [defendant] was not afforded the proper translator or didn't understand or didn't have the capacity.

"All of those things are pretrial motions. Not jury matters to be decided, [defense counsel]. The first time it sounded like you understood and accepted it. And then, you went right back into the same vein of inquiries. There was another objection. We had a second side bar, and you assured the Court that you did not wish to do that. That was not your intent by bringing up the American Disability Act or the level of education of [defendant] or his ability to effectively communicate. In any event, the Court indicated that I would be sustaining that objection and cautioned you to not return to that subject in that form given that that appeared to be a *Miranda* violation and or inappropriate questioning of [defendant], your client.

"That was the gist of the two side bars in summary. People wish to [be] heard on those two side bars any further?

"[THE PROSECUTOR]: Your Honor, only that the People believe that defense directly violated a motion in limine as well as was intentionally attempting to gain sympathy from the jury in a very inappropriate manner.

"THE COURT: [Defense counsel], would you like to add anything further about those two matters—or the two side bars I just referenced?

"[DEFENSE COUNSEL]: Yes, Your Honor. I was asking the officer that—you know, for a thorough, complete investigation it's important to ask questions of who, what, why, when, where. So I was asking if there was effective communication since he was just giving yes or no answers. The Court said we did the 402 *Miranda*. All his statements were coming in. So I wasn't interested in *Miranda* issue or preventing any of the statements coming in. I was trying to make a point that maybe the officer didn't do an effective investigation by being able to answer some of these

28.

questions of who, what, why, when, where. And my apologies. Maybe I didn't do it in [an] articulate way. My intent is not any way to disregard the Court's order or ask any inappropriate questions. I was just trying to— maybe in an ineffective way or inarticulate way of trying to demonstrate that maybe the investigation wasn't as thorough as it could have been because there wasn't effective communication about who, what, why, when, where. Again, my apologies to the Court. That was my intent. It wasn't to violate *Miranda*—disregard the Court's order. My apologies to the Court. That was not my intent.

"THE COURT: Counsel, the Court did not sustain the objection as to who, what, why, when, and where inquiries. Those are valid questions to ask of an investigator whether or not he marked those off on his investigation list. Nor did I, if I recall correctly, restrict your ability to ask the witness of the communication. It became more evident that you were attempting to introduce improper evidence in front of the jury when you were asking the officer about [the Americans with Disabilities] Act. When you were asking him the level of education your client had or has. If the officer inquired. When your witness—when your own client testified, you didn't ask of him if he has any level of education. Those could have been answered by your own client, and then, you could have argued it during argument that here is a gentleman who is—and I still don't know if he has 5th grade education, 11th grade education, some college, some vocation. No idea. And for you to ask those questions in front of a jury of a witness knowing that you could have done so in a *Miranda* violation hearing pretrial appears to me that you were trying to introduce evidence in front of the jury that would not be relevant. The effective communication, yes. I agree. But the level of education is not necessarily connected to effective discussions or conversations. There are many people who do not have formal schooling, but are quite effective in their ability to communicate. There are many people who have 5th grade or lower or no formal schooling that does not take them outside of effective communication. If anything, that's somewhat offensive to a lot of people in earlier generations that didn't have the means to go to school and gain higher education. That did not make them ineffective in their ability to communicate.

"In any event, my ruling stands that that was not appropriate. The objections were sustained, and the jurors were told to disregard by striking those answers, if any."

## B. Applicable Law and Standard of Review

An appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 724; e.g., *People v. Alvarez* (1996) 14 Cal.4th 155, 214–215; *People v. Rowland* (1992) 4 Cal.4th 238, 264.) Abuse of discretion occurs when the trial court's ruling ""'"falls outside the bounds of reason."'"" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

The trial court has broad discretion to determine the relevance of evidence. (*People v. Gurule* (2002) 28 Cal.4th 557, 614.) Evidence is relevant if it has any tendency in reason to prove a disputed material fact. (§ 210; *People v. Waidla*, *supra*, 22 Cal.4th at p. 718.)

Section 402, subdivision (b) directs that "in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. [The United States Supreme Court has] long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense." (*California v. Trombetta* (1984) 467 U.S. 479, 485.)

## C. Analysis

Defendant contends the trial court erroneously prevented him "from introducing evidence about his education and language barriers, which could have allowed the jury to fully evaluate the reliability and accuracy of [defendant's] statement to police." He argues the exclusion of such evidence violated his rights to due process, to present a defense, and to a fair trial. We cannot conclude the court abused its discretion in excluding the referenced testimony, nor that it violated defendant's constitutional rights.

Initially, we find the trial court did not abuse its discretion when it sustained objections to the challenged evidence. For example, during cross-examination, when the prosecutor asked defendant whether he remembered speaking to police following his arrest, defendant responded that he could not understand any written communication. The objection was properly sustained and stricken as nonresponsive to the question asked. Additionally, defense counsel was prevented from eliciting answers to the following questions after the trial court sustained objections: whether the detective was aware a lot of deaf mutes are illiterate; if the detective asked defendant whether he graduated from the 12th grade; if the detective asked defendant about his educational level; whether the detective called for a sign language interpreter; whether the detective was familiar with the ADA; and what accommodations were made for a 61-year-old deaf mute. Contrary to defendant's contention, these questions are not relevant to the disputed issues at trial. (See § 210; cf. *People v. Waidla*, *supra*, 22 Cal.4th at p. 718 [the testimony had some tendency in reason to prove the disputed material fact].)

Defendant contends that with the excluded testimony, he "could have presented ample evidence suggesting that the jury should, at the very least, proceed with caution in basing their conviction on [defendant's] confession." However, the excluded testimony related to the admissibility of defendant's statements and the validity of his *Miranda* waiver. Put differently, these questions bear on the legal issue regarding whether defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights, which was already decided outside the presence of the jury. (See § 402, subd. (b); see also *Crane v. Kentucky* (1986) 476 U.S. 683, 688 [these questions go to the purely legal question of whether it was knowingly and voluntarily made, which is assigned to the trial judge alone to resolve].) As such, defendant fails to demonstrate the trial court abused its discretion when it excluded evidence regarding Detective Hull's knowledge of defendant's intelligence or literacy level, language barriers, or the ADA. (See *People v. Jordan* (1986) 42 Cal.3d 308, 316 [trial court's exercise of its discretion "must not be disturbed

on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner"].)

Moreover, we cannot conclude defendant was denied a meaningful opportunity to present a complete defense. During the trial, defendant took the stand to testify on his own behalf that he hit Vaielua out of self-defense, explaining Vaielua had been following him and he was afraid Vaielua was going to kill him. And defense counsel was not prevented from asking Detective Hull questions relevant to the circumstances of the fight or his theory of self-defense, such as "Did you ask him who started the fight?" "Did you ask him how the fight started?" and "Why they were attacking each other." Notably, defense counsel did not ask defendant questions regarding his education and literacy level or language barrier when defendant took the stand. Later, when the prosecutor asked defendant whether he remembered speaking to police, and defendant's response that he could not understand any written communication was stricken as nonresponsive, defense counsel never asked the court to reopen testimony to follow up on defendant's response even though the trial court has discretion to allow the defense to offer additional evidence to their original case. (Pen. Code, §§ 1093, 1094; *People v. Rodriguez* (1984) 152 Cal.App.3d 289, 295; *People v. Newton* (1970) 8 Cal.App.3d 359, 383.)

Further, defendant's reliance on *Crane* to argue exclusion of the challenged testimony from Detective Hull violated his constitutional right to present a complete defense is misplaced. (See *Crane v. Kentucky*, *supra*, 476 U.S. at p. 687; see also *California v. Trombetta*, *supra*, 467 U.S. at p. 485.) "[T]he high court [in *Crane*] held that when the prosecution's case was based on the defendant's confession, it was error to preclude the defendant from introducing evidence about the manner in which his confession was obtained as part of his defense." (*People v. Hoyt*, *supra*, 8 Cal.5th at p. 938; see *Crane v. Kentucky*, *supra*, at p. 691.) However, "*Crane* does not require the admission of any and all defense-proffered evidence about the circumstances of a confession, without regard to the ordinary rules of evidence." (*Hoyt*, *supra*, at p. 938.)

Unlike in *Crane*, the prosecution's case was based on more than just defendant's statement to Detective Hull. Rather, it included, but was not limited to, video evidence of the incident giving rise to the charges, the testimony of two eyewitnesses, and the victim's testimony. Furthermore, unlike in *Crane*, here, the defense was not entirely premised on discrediting defendant's statement to Detective Hull. Rather, to the extent he suggested he acted in self-defense, defendant's statement to Detective Hull was relatively consistent with his trial testimony. As such, the issue presented in *Crane* is not present here. We conclude defendant fails to demonstrate he was denied "a meaningful opportunity to present a complete defense." (*California v. Trombetta*, *supra*, at p. 485.)

IV. **The Trial Court Did Not Violate Defendant's State and Federal Constitutional Rights to a Fair Trial and Due Process When It Refused to Instruct the Jury with CALCRIM No. 331**

Defendant claims the trial court erred by refusing to instruct the jury with CALCRIM No. 331 on "how to assess a witness's credibility when that person is disabled or has a language barrier."

A. **Relevant Factual Background**

The defense requested the trial court instruct the jury on CALCRIM No. 331. The defense noted the instruction was "[o]ut of an abundance of caution" because defendant is deaf and mute and required an American Sign Language interpreter through the trial. The People objected to the instruction on the basis that testifying using an American Sign Language interpreter is not different than using a Spanish language interpreter or any other language interpreter. The People also noted there had not been any evidence defendant had any actual impairment.

The trial court stated "there was no evidence to suggest that [defendant's] inability to converse in words in any language, whether it's English or another language, in any form or fashion impaired his ability to communicate. The impairment has to be something other than not being able to speak the language of the land or this court. And

33.

[defendant] testified. He was communicating with the Court and the jurors using the assistance of the sign language interpreter."

Additionally, the trial court pointed out the defense never suggested defendant's knowledge of American Sign Language was limited or that he was unable to communicate with the interpreter. "At no time was there any evidence from [defendant] that his inability to speak in words with his voice rather than with his hands was somehow impairing his ability to communicate. At no time was there any evidence of any limitations because of his difficulty and or natural inability to speak. Certainly, there was no evidence as to when this situation developed whether it was at birth or thereafter. There was no evidence."

## B.     Standard of Review

An appellate court reviews claims of instructional error de novo and without deference to the trial court. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581, 584; *People v. Quarles* (2018) 25 Cal.App.5th 631, 634 [refusal to give a requested instruction is reviewed de novo].)

## C.     Applicable Law

"A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "'"[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference."'" (*People v. Byers* (2021) 61 Cal.App.5th 447, 456–457; accord, *People v. Alexander* (2010) 49 Cal.4th 846, 921.)

In a criminal case in which a person with a developmental disability, or cognitive, mental, or communication impairment, testifies as a witness, the trial court must, upon request, instruct the jury to consider all the factors surrounding the person's testimony, including the person's level of cognitive development. (Pen. Code, § 1127g.) In

addition, the trial court must instruct the jury that, even though the person's disability or impairment may cause the person to perform differently as a witness, the difference does not mean the person is a more or less credible witness. (*Ibid.*) The trial court must also instruct the jury not to discount or distrust the person's testimony solely because of the person's disability or impairment. (*Ibid.*) A trial court fulfills this obligation in appropriate cases by giving the CALCRIM No. 331 instruction, which tracks the language of Penal Code section 1127g. (*People v. Keeper* (2011) 192 Cal.App.4th 511, 520; *People v. Byers*, *supra*, 61 Cal.App.5th at p. 456.)

CALCRIM No. 331 reads as follows:

"In evaluating the testimony of a person with a (developmental disability[,]/ [or] [a] (cognitive[,]/ [or] mental[,]/ [or] communication) impairment), consider all of the factors surrounding that person's testimony, including his or her level of cognitive development.

"Even though a person with a (developmental disability[,]/ [or] [a] (cognitive[,]/ [or] mental[,]/ [or] communication) impairment)[,] may perform differently as a witness because of his or her level of cognitive development, that does not mean he or she is any more or less credible than another witness.

"You should not discount or distrust the testimony of a person with a (developmental disability[,]/ [or] [a] (cognitive[,]/ [or] mental [,]/ [or] communication) impairment)[,] solely because he or she has such (a/an) (disability/ [or] impairment)."

"CALCRIM No. 331 informs the jury it should not decide whether an individual with a developmental disability or cognitive impairment is a credible witness based solely on the disability or impairment. Rather, the instruction advises the jury the level of the witness's developmental disability or cognitive impairment is one factor it must consider. … CALCRIM No. 331 'provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom "'traditional assumptions'" may previously have biased the factfinding process.'" (*People v. Catley* (2007) 148 Cal.App.4th 500, 508, quoting *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1393.)

35.

Penal Code section 1127g does not define "developmental disability" or "cognitive, mental, or communication impairment."  When the meaning of a statute is unclear, "'"we look to a variety of extrinsic aids, including the objects to be achieved, the evils to be remedied, legislative history, the statutory scheme of which the statute is a part, contemporaneous administrative construction, and questions of public policy."'"  (*People v. Keeper*, *supra*, 192 Cal.App.4th at p. 520; see *People v. Ramirez* (2009) 45 Cal.4th 980, 987.)

The Legislature enacted Penal Code section 1127g in 2004 as part of an Assembly Bill that made "'numerous changes to the Penal Code, Evidence Code, and the Welfare and Institutions Code to protect dependent persons and the elderly in court.'"  (Sen. Rules. Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 20 (2003–2004 Reg. Sess.) as amended Aug. 18, 2004, p. 7.)  The bill's author particularly sought "'to protect the rights of crime victims who are dependent on others for their care because of a developmental disability, traumatic brain injury, or degenerative brain disease'" by ensuring "'dependent people who are called upon to testify in a court of law are given the rights afforded to minors in the same situation.'"  (*Ibid*.; *People v. Keeper*, *supra*, 192 Cal.App.4th at p. 520.)

The Legislative Counsel described the Legislature's intent more broadly as "ensur[ing] that people who cannot live independently are treated fairly by the criminal justice system."  (Legis. Counsel's Dig., Assem. Bill No. 20 (2003–2004 Reg. Sess.) chaptered Sept. 28, 2004.)  Section 1 of the bill reflects this intent and states the purpose of the legislation is to protect "the rights of developmentally disabled persons and other dependent persons who are witnesses in criminal cases …."  (Assem. Bill No. 20 (2003–2004 Reg. Sess.) § 1; see Stats. 2004, ch. 823, § 1; Historical and Statutory Notes, 29B pt. 1A West's Ann. Evid. Code (2011 ed.) foll. § 177, p. 36.)

"Dependent persons" in this context are persons whose disability or impairment substantially restricts their ability to carry out normal activities or to protect their rights. (§ 177; *People v. Keeper*, *supra*, 192 Cal.App.4th at p. 521.)

**D.    Analysis**

Defendant contends that being deaf, by definition, is an impairment.  Defendant argues deaf persons are covered by the ADA, which makes them disabled as a matter of law.  He further notes that "disability" under the ADA is defined as "a physical or mental impairment that substantially limits one or more major life activities," which he states includes hearing.  (See 42 U.S.C. § 12102(1)(A), (2)(A).)  On this basis, defendant contends it was error for the trial court to conclude his language impairment was no different than any other person who required a language interpreter.  In support, defendant cites to scholarly articles regarding bias against the deaf community and disabled persons.  Although defendant contends deaf persons may be misunderstood at trial due to their expressions and gestures, and that in deaf culture, deaf persons often say "yes" when they do not mean "yes," this was not introduced as evidence at trial.  Appellate jurisdiction is limited to the four corners of the record on appeal, which does not include any evidence defendant had any physical or mental impairment, nor any evidence of bias against deaf culture.  (*People v. Waidla*, *supra*, 22 Cal.4th at p. 703, fn. 1; *In re Carpenter* (1995) 9 Cal.4th 634, 646.)

Defendant's reliance on *People v. Keeper*, *supra*, 192 Cal.App.4th 511 suggesting defendant is considered a dependent for purposes of this instruction is misplaced.  In *Keeper*, there was evidence the defendant suffered from depression, posttraumatic stress disorder, bipolar disorder, a low IQ of 77, and had a learning disability from a neurological impairment.  (*Id.* at pp. 518519.)  As a result, the defendant had difficulty organizing information, sequencing ideas, and using language for complex reasoning and planning.  (*Id.* at p. 519.)  Even so, the appellate court affirmed the trial court's decision

not to instruct the jury with CALCRIM No. 331, finding that although the defendant had mental disorders and a neurological impairment that affected some aspects of his life, "he did not present any evidence his disorder and impairment caused him to be a dependent person." (*Keeper*, at p. 521.) Here as well, there was no evidence defendant suffered any mental or physical illness, or evidence he had a low IQ, other than what the jury could infer from his written communication with Detective Hull.

CALCRIM No. 331 tracks the language of Penal Code section 1127g, which the Legislature intended "to apply to persons whose developmental disability, or cognitive, mental, or communication impairment, causes them to be dependent on others for care," and did not intend it to apply to individuals who "generally engaged in normal daily activities without assistance." (*People v. Keeper*, *supra*, 192 Cal.App.4th at p. 521; see *People v. Catley*, *supra*, 148 Cal.App.4th at p. 508 [CALCRIM No. 331 tracks the language of Pen. Code, § 1127g].) Although defendant claims he cannot live independently, there was no evidence at trial regarding whether defendant lives on his own or not, or whether he requires assistance with normal daily activities, to support this claim.

Even construing Penal Code section 1127g and CALCRIM No. 331 broadly, as the court did in *People v. Byers*, *supra*, 61 Cal.App.5th 447, without limitation to dependent persons, the evidence does not support an inference defendant had a "developmental disability" or "cognitive, mental, or communication impairment." (See *id.* at p. 457.) In *Byers*, the appellate court determined there was sufficient evidence to warrant CALCRIM No. 331 based on the victim's erratic behavior in court, refusing to be sworn in, answering "Is that a threat" to the question if she'd like to be called by her first name, and her admission that her posttraumatic stress disorder was even worse. While the *Byers* court found the victim's cognitive disabilities were fairly obvious, here, there was no evidence of any cognitive disability. Although defendant is deaf and mute, he was able to communicate with Detective Hull through writing and was also able to

communicate through two American Sign Language interpreters throughout the trial, and never expressed any difficulties or inability to understand the sign language interpreters. Therefore, since there was no evidence defendant had a developmental disability, or a cognitive, mental, or communication impairment, he fails to demonstrate the trial court erred by refusing to instruct the jury with CALCRIM No. 331.  (See *People v. Keeper*, *supra*, 192 Cal.App.4th at p. 521; *People v. Marshall*, *supra*, 15 Cal.4th at p. 39.)

Even assuming error, however, we find no prejudice under the harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).  (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829–831; *People v. Ervin* (2000) 22 Cal.4th 48, 91.)  Under this standard, we may consider the instructions as a whole, the jury's findings, and the closing arguments of counsel.  (*People v. Cain* (1995) 10 Cal.4th 1, 35–36; *People v. Eid* (2010) 187 Cal.App.4th 859, 883.)  Here, the jury was instructed that it must not let "bias, sympathy, prejudice or public opinion influence [its] decision."  The instruction explained this included bias based on disability either for or against the witnesses, attorneys, defendant, or alleged victim.  The court's general instruction was similar to CALCRIM No. 331's instruction that the jury should not decide whether an individual with a developmental disability or cognitive impairment is a credible witness based solely on the disability or impairment.  While it was clear to the jury defendant was deaf based on undisputed evidence and the fact he was assisted by sign language interpreters during the trial, there is nothing in the record to suggest the jury used defendant's inability to hear or speak verbally to assess his credibility as a witness.

Moreover, we cannot find defendant would have obtained a more favorable outcome had the instruction been given.  (See *People v. Moore* (2011) 51 Cal.4th 1104, 1130; *People v. Brown* (1988) 46 Cal.3d 432, 446–447; *People v. Breverman* (1998) 19 Cal.4th 142, 177, 178.)  Under *Watson*, we consider not "what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration."  (*Breverman*, p. 177.)  "'In making that evaluation, an appellate court

39.

may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.'" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1432, disapproved on other grounds in *People v. Covarrubias* (2016) 1 Cal.5th 838, 874, fn. 14.) Here, two eyewitnesses testified defendant continued hitting Vaielua after he had fallen to the ground, which was corroborated by video evidence and contradicts defendant's theory that he hit Vaielua out of self-defense. Given the substantial evidence supporting guilt, we conclude it is not reasonably probable defendant would have obtained a more favorable outcome had CALCRIM No. 331 been given.

## V. No Cumulative Error

Because we have rejected defendant's claims of prejudicial error, "'we likewise conclude that the cumulative effect of these asserted errors was not prejudicial and does not require reversal.'" (See *People v. Byers*, *supra*, 61 Cal.App.5th at pp. 459–460, quoting *People v. Bonilla* (2007) 41 Cal.4th 313, 360.)

## VI. Remand is Required Under Senate Bill 567

### A. Relevant Procedural History

A jury found defendant guilty of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and that he personally inflicted great bodily injury on Vaielua (*id.*, § 12022.7, subd. (a)). On August 13, 2019, the trial court imposed the upper term of four years for the assault conviction, plus a consecutive term of three years for the great bodily injury enhancement, for a total term of seven years in state prison.

In imposing the upper term, the trial court noted, "[Defendant] is before the Court for what appears to be for certain his fourth and possibly his fifth felony conviction. And therefore, the Court will select the upper term of the four years in the 245(a)(1), enhancement with the three years for 12022.7(a) for a grand total of seven years in state

prison at 15 percent conduct credits." No certified records of conviction were entered into evidence or otherwise presented. The trial court stated it was "aware through the probation report of the extensive criminal history that [defendant] apparently has, which was not clearly given to the Court."

## B.    Applicable Law and Standard of Review

Effective January 1, 2022, Senate Bill 567 amended Penal Code section 1170, subdivision (b), making the middle term the presumptive sentence for a term of imprisonment unless certain circumstances exist. Penal Code section 1170, subdivision (b) now states in part:

> "(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).

> "(2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.…

> "(3) Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury. This paragraph does not apply to enhancements imposed on prior convictions."

We decide de novo the legal issue of whether defendant should benefit from the change in the law. (See *People v. Lofchie* (2014) 229 Cal.App.4th 240, 250; *People v. Monk* (2018) 21 Cal.App.5th Supp. 1, 4.)

## C.    Analysis

Senate Bill 567 became effective January 1, 2022. When the Legislature amends a statute reducing punishment without stating whether it should be given retroactive effect, the new law applies in all cases in which the judgment is not yet final. (*In re Estrada*

41.

(1965) 63 Cal.2d 740, 742.) *Estrada*'s retroactivity also applies where there are ameliorative changes in the law that provide a new opportunity for imposition of a lesser punishment. (See *People v. Frahs* (2020) 9 Cal.5th 618, 629–631 [*Estrada* requires retroactive application of new law providing a new opportunity for imposition of a lesser punishment—mental health diversion]; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308 [*Estrada* required retroactive application of new law providing a new opportunity for imposition of a lesser punishment—a juvenile disposition]; *People v. Francis* (1969) 71 Cal.2d 66, 76–77 [*Estrada* required retroactive application of new law providing an opportunity for imposition of a lesser punishment—misdemeanor sentencing].) Because Senate Bill 567 makes a lesser punishment possible, and because the Legislature gave no indication it intended the changes to apply prospectively only, its ameliorative changes apply retroactively to nonfinal judgments. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; *People v. Lopez* (2022) 78 Cal.App.5th 459, 461; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902; see *People v. Frahs*, *supra*, at p. 634; *In re Estrada*, *supra*, at p. 742; see *People v. Esquivel* (2021) 11 Cal.5th 671, 677.)

Defendant's judgment is not yet final since his appeal was still pending when Senate Bill 567 became effective. (See *People v. Babylon* (1985) 39 Cal.3d 719, 722; *In re N.D.* (2008) 167 Cal.App.4th 885, 891; *People v. Shabazz* (2015) 237 Cal.App.4th 303, 312.) Therefore, the ameliorative changes under Penal Code section 1170, subdivision (b) apply to defendant's judgment.

The trial court imposed the upper term for the assault with a deadly weapon conviction based on its conclusion this is defendant's "fourth and possibly his fifth felony conviction." It is undisputed this was not a fact found true by the jury or to which defendant stipulated. And while the court may rely on certified records of criminal convictions to impose an upper term based on the defendant's prior convictions, defendant asserts, and the People concede, the court did not have a certified record before

42.

it, only the probation report's summary of defendant's criminal history.  Therefore, it is necessary to remand the matter for resentencing under Penal Code section 1170, subdivision (b), as amended.  (See *People v. Garcia*, *supra*, 76 Cal.App.5th at p. 902.) We express no view on how the court should exercise its sentencing discretion on remand.

## DISPOSITION

The matter is remanded to the trial court for resentencing under Penal Code section 1170, subdivision (b), as amended by Senate Bill 567.  In all other respects, the judgment is affirmed.


PEÑA, Acting P. J.

WE CONCUR:


MEEHAN, J.


DE SANTOS, J.